## Louis Evers v. The State.

### No. 56. *Decided December 3.*

1. **Manslaughter — Insulting Words.**—In order to reduce a homicide from murder to manslaughter on account of insulting words, our Penal Code, article 598, declares that the killing must take place immediately upon the uttering of the insulting words.

2. **Proof of Character of Deceased as Dangerous and Violent, Admissible when.**—It is not competent to prove the reputation of deceased as a violent and dangerous man where the evidence has not shown that at the time of the homicide he was doing some act indicating a purpose to take the life of defendant, or to do him some bodily harm.

3. **Evidence—Hearsay—Exclamation of Third Parties.**—On a trial for murder, where it was shown that sometime after the killing, when the deputy sheriff drove up to the house to arrest defendant, and defendant came out of the house with a blanket on his arm, that the hackman who drove the deputy to the house exclaimed, "There he goes! there he runs! catch him!" *held*, that such testimony was hearsay and inadmissible, and that if the hackdriver saw the defendant making his escape he should have been called as a witness himself to testify to that fact.

4. **Charge of Court—Drunkenness.**—Where on a trial for murder the court charged the statute on drunkenness (Penal Code, article 40a), and then

instructed the jury, that "The law just quoted places a person charged with crime before the law to be tried without reference to his drunkenness, unless said drunkenness goes to the extent of producing temporary insanity. It is therefore your duty, as a preliminary inquiry, to discover the mental status of the defendant at the time of the homicide." *Held,* that the said charge was insufficient in failing to define "temporary insanity," and in failing to instruct the jury that they could consider temporary insanity in mitigation of the penalty, after they had determined the degree of murder. Clore's case, 26 Texas Ct. App., 624; and Ex Parte Evers, 29 Texas Ct. App., 539.

**5. Intoxication as an Element in Crime—Article 40a of Penal Code Construed.**—By the terms of article 40a two purposes were clearly intended: 1. To eliminate mere intoxication as a defense in any criminal prosecution whatever, regardless of the constituent elements of the crime. 2. To prevent temporary insanity thus produced from being used as a defense to any crime, but permitting it to be introduced in murder cases to determine the degree, and in all criminal prosecutions to mitigate or lessen the penalty. The object of the statute was to prevent parties from pleading their own wrong, after voluntarily placing themselves under the influence of intoxicating liquors.

**6. Same—Common Law Rule.**—The underlying principle of our statute is the common law rule, viz., that a sane man who voluntarily puts himself in such a condition as to have no control of his will or actions, must be held to intend the consequences springing therefrom, even though such intoxication rendered him insensible to his surroundings, unconscious of his acts, and deprive him of memory or understanding. See the opinion for a discussion in extenso of the contrariety of doctrine which has been held upon the subject during the past sixty years, in the English and American courts, and the conclusion reached that "our statute is right in excluding mere drunkenness as evidence in criminal cases."

**7. Same—Scope of Our Statute on Drunkenness.**—Our statute on drunkenness permits the intoxicated person, when his intoxication is so excessive as to render him unconscious that the act he is doing is wrong, and will subject him to punishment, to plead his condition; and if it appears the design to kill was not previously formed or premeditated, or arising out of a previous difficulty, or from revenge, or executed with cool, deliberate, and passionless action indicating-malice, but was the result of a sudden, rash, and unpremeditated design, springing out of inconsiderate or irrational action or excitement, and originating in a mind so inflamed by intoxicants as to be wholly incapable of reflection or self-control, the jury should find the defendant guilty of murder in the second degree, but nothing less; and may also reduce the penalty they would otherwise attach to the crime but for his condition. It is only in murder cases that a defendant can plead temporary insanity as a reduction of the *degree* of crime. In no other character of crime is it admissible to change its nature or *want of constituent elements*. And it was so at common law.

**8. Insanity.**—The settled rule and test as to sanity, is the capacity and power to distinguish between right and wrong as to the particular act charged as an offense, and a person wanting in such knowledge and consciousness is insane and irresponsible for any crime committed by him. It is a full excuse for crime, except when committed by a party in a fit of recent intoxication.

**9. Drunkenness—"Settled Insanity"—"Temporary Insanity."**—There are two kinds of insanity produced by alcoholism: 1. Delirium tremens, or "settled insanity," from long and continued habitual drunkenness. 2. Temporary insanity, or drunkenness, directly resulting from drink. The former is

habitual or fixed madness, and though contracted by the will of the party, is a sufficient excuse for crime. The latter is that condition of the mind directly produced by the use of ardent spirits; and where a fit of intoxication is carried to such a degree that the person becomes incapable of knowing the act he is doing is wrong and criminal, he is in that condition referred to by the statute as being "temporarily insane." The first is from drinking as a *remote* result. The second is from drinking as a *direct* result. The first result is involuntary. The second voluntary. In the first there is no criminal responsibility. In the second responsibility never ceases. Following Kelley's case, ante, page 216.

10. Case Overruled.—In so far as the opinion in Lyle's case, ante, page 103, announces rules in conflict with the rules announced in this case, that case is overruled.

APPEAL from the District Court of Bexar. Tried below before Hon. G. H. NOONAN.

On a trial under an indictment charging him with the murder of one Robert Richter, appellant was found guilty in the court below of murder in the second degree, and his punishment assessed at forty years in the penitentiary. This is a second appeal in this case. The first appeal was from a judgment on habeas corpus in the District Court, after indictment found, refusing him bail; and that case will be found reported as Ex Parte Louis Evers, 29 Texas Court of Appeals, 539, and contains a full statement of all the facts which had been adduced on the trial in that case in the court below.

In so far as the testimony is concerned, as elicited on the trial from which the present appeal is taken, we deem it only necessary to reproduce the following, which was prepared by Judge Simkins, as preliminary to his opinion in the case (hereafter reported), to-wit: The evidence shows that some months previous to the homicide, there had been a difficulty between defendant and deceased, Richter, in which defendant was worsted. That early in the morning of the day in which the homicide occurred, defendant began drinking, and about 11 o'clock, meeting deceased in a saloon, renewed the quarrel and struck deceased; the parties grappled, but were separated. Sometime afterwards, meeting in the street, they again quarreled, defendant starting it. Defendant then went home, armed himself with two six-shooters, went to deceased's house, and called him out, stating that deceased had treated him as a dishonorable man, and he had come to settle it. Deceased threw open his shirt and told him to kill him. Bystanders got the defendant to leave, and he went off a short distance, when deceased called to him to come back and kill him, and taunted him. Defendant again came to the house, and deceased taunted and jeered him, and told him to kill him; that he "was a Fredericksburg Dutchman." Defendant told deceased he didn't want to kill him, because he had a family, but he would settle the difficulty with pistols or fists, or make friends. Deceased told him, "Damn his pistols," and also told him he "didn't know who his father was."

Defendant was again persuaded to leave, and went off and stopped about 100 yards away, at another house, and deceased kept calling to him to come back and kill him, and using other taunting words. Defendant came back and went up to the gate, and asked Richter if he had called him back. He replied no. Richter was standing inside of his yard, in his stocking-feet and shirt-sleeves, and was unarmed. His wife was near him on the porch. Defendant took out one of his pistols, examined and returned it, saying it was not good enough, and took out the larger one and fired at Richter, but missed him. Richter turned, and was running away when defendant fired the second shot, killing him instantly, shooting him in the back of the neck. Defendant then was about leaving, when Mrs. Richter spoke to him, and he shot at her. Mrs. Richter ran into the house and got a gun. On seeing her coming defendant began running, and dodged as she fired, and the shot passed over him, and he went away.

There is strong testimony of temporary insanity. Defendant was crying while leaving and returning to Richter's house, and seemed much under the influence of liquor, and kept displaying and handling his pistols, and seemed very mad and excited.

*Perry J. Lewis* and *Denman & Franklin,* for appellant.—1. We believe manslaughter was an issue fairly presented by the evidence in this case, and the law applicable thereto should have been given by the lower court, as requested by appellant.

Manslaughter under our code is an unlawful homicide, committed under a defined degree of mental excitement, produced by adequate cause. Adequate cause is defined by the code.

The evidence in this case shows a killing by defendant when his mind was in an inflamed and excited condition. The verdict of the jury finds that his mind was not cool and collected.

Under the court's charge, however, they had to convict him of murder in the second degree, if they found that the killing was not the result of the formed design of a calm and sedate mind, although they may have believed that the mind of the defendant at the time of the homicide was in such condition that it was incapable of cool reflection, and that condition resulted from adequate cause.

To justify the refusal of the court to charge on manslaughter, it must appear that there was no evidence fairly raising that issue. An inspection of the record will show that there is evidence raising the issue.

It is true, his drunkenness alone would not be adequate cause; neither would the abusive language of deceased to him, alone, be adequate cause; but the two combined, together with the other facts proven, and all the circumstances surrounding and preceding the killing, might have been

regarded by the jury as constituting adequate cause.    At least, it was their province to pass on the question.    This province the judge invaded when he refused to charge on manslaughter.    Willson's Crim. Stats., sec. 1018;  Wadlington v. The State, 19 Texas Ct. App., 266.

2.  Immediately prior to the killing, during the wrangle between the participants, Evers proposed to make friends with deceased.    The proposition was refused, with an oath, and with the following words addressed to him by deceased, also accompanied with an oath:   "I know who my father is, but you don't know who yours is."    This was a charge of illegitimacy; it was an insult to defendant's mother; it branded him as a bastard, and published her as an adulteress.    This language demanded a charge on manslaughter.    By the words of the statute, such language was adequate cause to reduce a homicide to manslaughter.

If by the strict letter of the law the use of these words, standing alone, was not adequate cause, yet, when taken together with all the other acts of aggravation shown by the evidence, it clearly raised the issue of manslaughter, and required a charge on that issue.    Escareno v. The State, 16 Texas Ct. App., 85.

3.  We submit further, that as the issue of temporary insanity was raised by the evidence and charged on by the court, a definition of such insanity should have been given in the charge.

This character of insanity could have been considered by the jury, under the statute relating to drunkenness, on the question of punishment. The law has given them wide discretion on this question.

When they find a defendant guilty of murder in the second degree, they can virtually assess a life penalty in such cases.    In this case they have done so.    It can not be said, then, that an error or an omission in the court's charge on the subject of temporary insanity has become immaterial because of the degree of guilt found by the verdict.    Such insanity should have been considered by the jury in assessing the punishment for, as well as in the finding the degree of, the homicide.    How can they consider it in the absence of a definition by the court?

The insanity referred to by the statute is, temporary, and such as is produced by the voluntary recent use of ardent spirits.    It is sui generis. Its existence as the result of a single cause is recognized by the statute. It must have a definition and legal meaning, and what that is, the jury should have been told.    Instead of so doing the court quoted the statute, and then charged the jury as follows:   "The law just quoted places a person charged with crime before the law to be tried without reference to his drunkenness, unless said drunkenness goes to the extent of producing temporary insanity."

In other words, the court says a drunken man is a sane man unless he is an insane man.    Now, what could the jury understand from this charge

would or would not amount to such a disturbance of the defendant's mental equilibrium as would or not amount to temporary insanity?

They could not apply to the consideration of his case the ordinary, every-day definition of insanity, for the insanity referred to in the statute is temporary, and results from the recent use of liquor. They were left, therefore, to assess the defendant's punishment in the same way, and from the same standpoint, as if he had not been drunk when the homicide was committed, unless they found that he was laboring under some undefined mental condition resulting temporarily from the recent use of liquor. What they should do if· they found such mental disturbance in defendant they are not told.

" Here is the statute," says the court; " I am somewhat bothered about it myself; take it, and worry what meaning you can out of it."

The charge that a drunken man's act is to be considered regardless of such drunkenness, unless he is temporarily insane therefrom, is essentially erroneous, and was calculated to prejudice defendant's case before the jury. Certainly it has the effect of increasing the penalty that otherwise might have been assessed against him.

It was this view of the law that probably controlled the court and caused it to refuse all charges on manslaughter, and we will therefore consider it briefly: If the charge is a correct statement of the law, then drunkenness may become a felony. To illustrate: A gets drunk, too drunk to know his own house; he goes into his neighbor's house by mistake, takes out his neighbor's coat by mistake, walks off with it, and is arrested with it, and is charged with theft. On his trial, evidence is offered to show that he was drunk when he took the coat and when he entered the house, and that he would have done neither if he had been sober, and that both acts were in fact nothing but drunken mistakes, and it is urged that his intent is the gist of the offense, and any evidence showing no criminal intent in his acts is admissible. This evidence, if the charge. under consideration is the law, would be irrelevant, " without reference to his drunkenness." Upon the rejection of such evidence the whole defense would. fail, and the proof would show the taking by A of the property of B, without his consent, etc.. and from these acts, unexplained, the fraudulent intent would be inferred.

In other words, if the charge correctly states the law, voluntary drunkenness is not admissible in evidence in any criminal case, unless it can be followed up by proof of temporary insanity resulting therefrom.

We submit further, that the evidence as to deceased's character was admissible in evidence. The undisputed evidence shows, that defendant went to deceased's house armed, had full opportunity to kill deceased, but did not; left the house, was called back by the deceased, insulted, urged to shoot, and every effort made to provoke a difficulty. That deceased had previously moved his gun from the rear room of the house to

a convenient position near the front door. That to Florea he made the threat that if he could draw the load from his gun he would kill defendant. His character was explanatory of his movements. It tended to show his motives in taunting defendant. It evidenced to defendant, in connection with the previous difficulties between the parties, the taunting language and dares of deceased, what were the purposes of the deceased at the time.

The threat of deceased being in evidence, his character became admissible under the liberal provisions of our statute. Penal Code, art. 608; Willson's Crim. Stats., sec. 1054.

4. Again, there was a dispute in the evidence as to whether the deceased used foul and insulting language to defendant; and his character and habit in that regard was admissible to be considered by the jury in weighing the conflicting testimony. Sledge v. Rayburn, appeal from Hays County, and decided by this court some years ago.

No brief for the State has come into the hands of the Reporter.

SIMKINS, Judge.—There are numerous bills of exceptions and assignments of error, but it will be only necessary to consider the following:

1. The defendant complains that the court refused to charge the jury on manslaughter. The ground relied upon was the fact that Richter, while jeering at and abusing defendant, told him "he didn't know who his father was." If any such remark was made by Richter, it can not avail defendant; for after it was made, said defendant turned and went away, and Richter went into the house, and according to the same witness (Florea), called to him to come back, and shook his fist at him. The statute declares, that to reduce homicide to manslaughter, the killing must take place immediately upon the uttering of the insulting words. Penal Code, art. 598. The insulting language seems to have been disregarded. Defendant drew out of his own witness, Florea, the fact that defendant would not have come back, even after the alleged insult, if deceased had not kept calling him. But while the taunts and cries of "Come back and kill me," of the infuriated Richter may have led to that result, it would be none the less murder on the part of defendant.

2. The court did not err in refusing to permit defendant to prove the reputation of deceased as a violent, dangerous man. If such a character could have been proven, the deceased had certainly done no act indicating any purpose whatever to take defendant's life, or do him any harm: He stood in his yard, in shirt-sleeves and stocking-feet, and, according to defendant's own witness, had declined to touch defendant's pistol, when defendant proposed to have a combat. Willson's Crim. Stats., sec. 1054.

3. The court erred in admitting the cry of the cab driver, "There he

goes," referring to the defendant, when the officer went out to arrest him. If the cab driver saw the defendant making his escape, he ought to have been placed on the stand to testify to that fact.

4. There is, however, a serious question presented by the record, which will necessitate a reversal of this cause. The court charged the statute on drunkenness, and then instructed the jury that " the law just quoted places a person charged with crime before the law to be tried without reference to his drunkenness, unless said drunkenness goes to the extent of producing temporary insanity. It is therefore your duty, as a preliminary inquiry, to discover the mental status of the defendant at the time of the homicide." Conceding the charge to be correct, so far as it goes, it was manifestly insufficient merely to submit to the jury, without further comment than the charge above quoted, a statute about which there was such uncertainty and diversity of opinion, and let the jury draw their own inference as to its purport and meaning. We think the exception, duly reserved by the defendant, was well taken, to the effect that the court erred in failing to define " temporary insanity," and in failing to charge they could consider it in mitigation of the penalty after they had determined the degree of murder.

The statute on drunkenness (article 40a, Penal Code) has been twice considered and passed upon by this court, and it was held, as we think, correctly: first, that mere intoxication from the recent use of ardent spirits should not excuse nor mitigate the degree or penalty of crime; second, that intoxication must go to the extent of producing temporary insanity before it can mitigate the penalty in any crime, or be considered in murder cases to determine the degree of murder. Clore's case, 26 Texas Court of Appeals, 624, and Evers' case, 29 Texas Court of Appeals, 539, in which this case was heard on habeas corpus on a state of facts different from that here presented. The difficulty, however, seems not to be so much in the terms of the statute as in the reluctance of the trial courts to hold that one grossly intoxicated, or temporarily insane from intoxication, is any more liable for punishment for crime than one insane from any other cause.

The history of the statute is well known. Some ten years ago, one Porter, a traveling actor, was shot down without provocation, in an eastern town in this State. The defendant was tried and acquitted on the ground of temporary insanity, caused by drunkenness. The Legislature, assembling shortly after, passed this act: "Article 40a. Neither intoxication, nor temporary insanity of mind produced by the voluntary recent use of ardent spirits, shall constitute any excuse in this State for the commission of crime, nor shall intoxication mitigate either the degree or penalty of crime; but evidence of temporary insanity produced by such use of ardent spirits may be introduced by the defendant in any criminal prosecution in mitigation of the penalty attached to the offense for which

he is being tried, and, in cases of murder, for the purpose of determining the degree of murder of which the defendant may be found guilty." By its terms there were two purposes clearly intended; first, to eliminate mere intoxication as any defense in any criminal prosecution whatever, regardless of the constituent elements of the crime; second, to prevent temporary insanity from being a defense to any crime, but permitting it to be introduced in murder cases to determine the degree, and in all criminal prosecutions to mitigate or lessen the penalty. The object of the statute was to prevent parties from pleading their own wrong, after voluntarily placing themselves under the influence of drink, and becoming a terror to the community, or a menace to other citizens, whose feelings are often outraged and their lives endangered or destroyed by the insolence and recklessness of such intoxicated persons. The underlying principle of the statute is that laid down by common law writers, to-wit, that a sane man, who voluntarily puts himself in such a condition as to have no control over his will or actions, must be held to intend the consequences springing therefrom. Puff. De Jur. Nat., lib. 3, ch. '6, sec. 4; 2 Co. Litt., 247a; 1 Hale, P. C., 32; 4 Bl. Comm., 20.

There is no question that, under the common law, intoxication was not deemed a defense for any criminal act, even though done while a person was insensible to his surroundings, unconscious of his acts, and had no memory or understanding (Reniger v. Fogossa, 1 Plowden, 19; Beverley's case, 4 Coke, 123; Pirtle v. The State, 9 Humphrey, 663); and such was the law in England and America as late as 1835. The State v. John, 8 Ired., 333; The State v. Turner, 1 Wright (Ohio), 31; Cornwell v. The State, 1 Mart. & Y., 147; Rex v. Carroll, 7 Car. & P., 145.

During the past sixty years there has been a persistent, and in the English and many of the American courts a successful, effort to ingraft upon the common law doctrine the proposition that drunkenness ought to be admitted in evidence, not to excuse, justify, or mitigate the crime, but simply to throw light upon the mental status of the offender, to enable the jury to find out what crime had been committed; or rather, by proving the absence of the necessary constituents of the crime (such as malice, premeditation, intent, etc.), to show that *no crime* was committed. At first the proposition was only insisted upon and applied in murder cases, or assaults with intent to murder; but the doctrine was soon pushed out to its logical results, and is now applied by some courts to every species of crime which has an intent. It is now generally held that intoxication is admissible as evidence in all the States where murder is divided into degrees, not to deny the guilt, but to determine the degree. Whart. Crim. Law, sec. 51. But this innovation on the common law was vigorously opposed by the early judges. It was, indeed, by its advocates, admitted to be dangerous doctrine, and one that ought to be received with caution. Id.; The State v. John, 8 Ired., 330; Pirtle case, 9 Humph.,

663. Mr. Wharton says: "It has been held with marked uniformity in this country that voluntary drunkenness is no defense to the factum of guilt. The only difference has been the extent to which evidence of drunkenness is received to determine the exactness of intent and the extent of deliberation." Whart. Crim. Law, sec. 49.

There has been no subject upon which courts have so widely differed, or in which the same courts have so often changed their views, as upon this question. A fair illustration of this is shown in the Tennessee decisions referred to in the Lyle case, ante, p. 103, which case, in so far as it conflicts with this case, is overruled. In 1827 the law was laid down, in accord with the best authorities, that insanity resulting from long continued drunkenness is an excuse for crime; but insanity the immediate result of intoxication is not. Cornwell case, Mart. & Y., 147; Bennett case, Mart. & Y., 133. But in 1843, the court, in a murder case, laid down the doctrine in all its fullness: "That although drunkenness, in point of law, constitutes no excuse for crime, still, when the nature and essence of a crime are made by law to depend on the peculiar state of defendant's mind at the commission of the act, drunkenness is a proper subject of consideration. The question is, what is the mental status at the time of the act, and with reference to the act? This is not holding that drunkenness is an excuse, but it is an inquiry whether the very crime defined by law has been in fact committed. If the mental state required by law to constitute the crime be one of deliberation and premeditation, and drunkenness or other cause excludes the existence of such mental state, then the crime is not excused by the drunkenness or such other cause, but has not in fact been committed." Swan's case, 4 Humph., 136. This reasoning authorized the introduction of drunkenness in any degree in all cases of crime.

But in 1849, in the Pirtle case (9 Humphrey, 663), the same court expressly asserted the common law doctrine to be correct, and expressly limited the doctrine announced in Swan's case to murder cases only, and declared that this was only admitted in Tennessee because of the statute of that State dividing murder into two degrees; and also asserting that the drunkenness must be excessive, and that it can only be introduced to reduce the degree of murder, but not to make it *manslaughter*. But while the court adhered to common law, it also indulged in reflections that tend to sustain the propositions of the Swan case, and question the correctness of the common law. The State v. Cross, 27 Mo., 232. In the following year the question came again before the Tennessee courts in the case of Haile v. The State, 11 Humphrey, 154, and the court sustained the views announced in Pirtle v. The State, but held that the degree of drunkenness which may be considered to shed light on the mental status need not be that excessive intoxication which renders a party incapable of a criminal intent, but that *any* state of drunkenness is

a proper subject of inquiry. So it appears that in Tennessee drunkenness to any extent is admissible only in murder cases, and for the sole purpose of reducing the crime, if at all, to murder in the second degree, but not to manslaughter or any lower degree of crime. Cartwright v. The State, 8 Lea, 377. But the law laid down by the Pirtle case seems to have been the law in Texas prior to the statute, as declared by this court in Colbath's case, 4 Texas Court of Appeals, 76, and in McCarty's case, 4 Texas Court of Appeals, 461. The statute is right in excluding mere drunkenness as evidence in criminal cases.

It is certainly difficult for an ordinary mind to understand how drunkenness is admissible to shed light on the mental status of the offender, and yet not mitigate his offense; how it may be a circumstance to be considered by the jury in determining the intent, and yet not be an excuse for crime, if taken into consideration at all. It is claimed there is no inconsistency, because intoxication simply goes to show that *no crime* has been committed. It would certainly seem, that if no crime had been committed, it is immaterial whether defendant was drunk or sober. If all the facts in the case except the drunkenness show a crime was committed, yet the element of drunkenness changes the nature of the offense, and makes it *nothing*, then it must certainly excuse the crime. It unquestionably overturns the common law doctrine; and the naked proposition, divested of its metaphysical distinctions and fine spun explanations, is boldly asserted, that drunkenness can avoid moral and legal responsibility for crime.

Punishment of crime rests upon the theory that the criminal not only has possession of his will, but of the power to control it. It is upon this fact that human responsibility must rest. The drunkard does not lose the *power* to control his will unless unconscious, but he does lose the *desire* to do so. So all criminals become such because they lose the desire to control their will; hence the necessity for the strong arm of the law to supply that missing incentive for good behavior which was lost by vicious indulgence.

It can not be denied there is a great difference between a crime deliberately planned and executed by a sober, calculating criminal, and one hastily committed by one whose mind is clouded or infuriated by intoxication; but human laws are based upon considerations of public policy, and look rather to the maintenance of the social order and personal security of the citizen than to fine discriminations in the conduct of wrongdoers. Against the ordinary assassin or wrongdoer there may be some check; caution may ward off the crime, or innocence may escape its work; but the drunkard is dangerous to the innocent as well as to the most depraved. Whart. Crim. Law, sec. 49.

But the statute of the State definitely settles this question, and this court is not at liberty to follow the reasoning under which other courts

have drifted far away from the common law. Yet the statute, wisely conceding something to modern thought, permits the intoxicated person, when his intoxication is so excessive as to render such person unconscious that the act he is doing is wrong, and will subject him to punishment, to plead his condition; and if it appears the design to kill was not previously formed, or premeditated, or arising out of a previous difficulty, or from revenge, or executed with cool, deliberate, and passionless action indicating malice, but was the result of a sudden, rash, and unpremeditated design, springing out of inconsiderate or irrational action or excitement, and originating in a mind so inflamed by intoxicants as to be wholly incapable of reflection or self-control, the jury should find the defendant guilty of murder in the second degree, but nothing less; and may also reduce the penalty they would otherwise attach to the crime but for his condition. It is to be observed that it is only in murder cases he can plead temporary insanity as a reduction of the *degree* of crime. In no other character of crime is it admissible to change its nature *for want of constituent elements.* It was so at common law. As Wharton says, " there was no denial of the *fact* of guilt."

Hence the court erred in not instructing the jury, that if defendant, while temporarily insane, formed the design to slay Richter, and immediately carried his design into execution, they could take into consideration his condition, both in determining the degree of murder and in fixing the penalty to be assessed by them. The jury, without instruction, having found the offense to be murder in the second degree, may have found a lower penalty had they been so instructed.

The next question is, what does the statute mean by the term "temporary insanity?" Whatever be the form or cause of insanity, it is settled by all authorities that the law will not consider it in a criminal case unless it deprives a person of the capacity and power to distinguish between right and wrong as to the particular act charged as an offense. If a person has knowledge and consciousness that the act he is doing is wrong, and will deserve punishment, whatever be his mental or physical weakness, he is, in the eye of the law, of sound mind and memory, and consequently the subject of punishment. But, if a person is incapable of having a knowledge and consciousness that the act he is doing is wrong and criminal, and will subject him to punishment, he is insane, and not responsible for crime committed by him. Willson's Crim. Stats., sec. 81, and cases cited: Nixon's case, 32 Kan., 205; 5 Lawson Def. Crime, "Insanity," 231; Whart. & S. Med. Jur., 45.

Though it is a general rule that insanity is an excuse for crime, there is one exception to the rule, and that is, where the crime is committed by a party in a fit of recent intoxication, though the party is bereft of his reason by drunkenness, and therefore is insane as from any other cause. All authorities recognize drunkenness to be a species of insanity that may be

attended, when carried far enough, with loss of reason and self-control, while under the direct effects of the intoxicant; but this effect is voluntary, and brought about by the acts of the party, and thereby differs from ordinary insanity, which is the act of Providence, and the sufferer is not responsible.

There are two kinds of insanity produced by alcoholism: First. Delirium tremens, caused by the breaking down of the person's system by long continued or habitual drunkenness, and brought on by abstinence from drink. This is what is called "settled insanity," to distinguish it from "temporary insanity" or drunkenness, directly resulting from drink. "Settled insanity," from the earliest times, has been held to be a complete defense to crime. Lord Hale says: "If by means of drunkenness an habitual or fixed madness be caused, though contracted by the will of the party, it will excuse crime." P. C., pt. 1, c. 4. In United States v. Drew, 5 Mason, 28, decided in 1828, Story, Judge, says: "Insanity, whose *remote* cause is habitual drunkenness, is an excuse for crime committed by the party while so insane, but *not intoxicated*, or under the influence of whisky. Such insanity has always been deemed a sufficient excuse for any crime done under its influence." United States v. McGlue, 1 Curt., 1; Maconnebey v. The State, 5 Ohio St., 77; Carter v. The State, 12 Texas, 500; Erwin's case, 10 Texas Ct. App., 702. Second. The other kind of insanity is that condition of the mind *directly* produced by the use of ardent spirits; and where a fit of intoxication is carried to such a degree that the person becomes incapable of knowing the act he is doing is wrong and criminal, as above stated, he is in that condition referred to by the statute as being "temporarily insane," as stated by this court in the Kelley case, ante, p. 216. There is no difference between the two kinds of insanity so far as the mental *status* is concerned, but they differ widely in their causes and results. The first is from drinking as a *remote* result; the second from drinking as a *direct* result. The first is an involuntary result, from which all shrink alike; the second is voluntarily sought after. In the first, there is no criminal responsibility; but in the second, responsibility never ceases.

There is evidence only of temporary insanity in the record, and the court erred in not explaining temporary insanity to the jury, and also instructing them, that if they believed that defendant was temporarily insane at the time he formed the intent to kill deceased, and the same was carried into execution while defendant was so insane, they should take such insanity into consideration, both in determining the degree and in reducing the penalty. For the errors indicated, the cause is reversed and remanded.

*Reversed and remanded.*

Judges all present and concurring.