IRVIN LEROY BROOKS *v.* STATE OF
MARYLAND
[No. 312, Initial Term, 1967.]

292

*Decided October 27, 1967.*

The cause was argued before MURPHY, C. J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Stuart E. Hirsch,* with whom was *Nelson R. Kandel* on the brief, for appellant.

*Alfred J. O'Ferrall, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Alan B. Lipson, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

On November 18, 1966 the appellant was convicted of murder in the first degree and attempted robbery with a deadly weapon in the Criminal Court of Baltimore, Judge George L. Russell, Jr. presiding without a jury. He was sentenced to im-

prisonment for the balance of his natural life on the conviction of murder and to imprisonment for a term of five years on the conviction of attempted robbery with a deadly weapon, the sentences to run concurrently.

The questions raised on this appeal go to the sufficiency of the evidence with respect to each conviction. The trial court found, as a fact, that the appellant actively participated in an attempted robbery during the course of which murder was perpetrated. He was therefore guilty of murder in the first degree. Md. Code (1967 Replacement Volume) Art. 27, § 410. The substance of the appellant's contentions is that there was not sufficient evidence to establish that the murder was committed in the attempt to perpetrate a robbery and that, even if the evidence were sufficient to so establish, there was not sufficient evidence that the appellant was a participant.

There was evidence before the court as follows. On March 11, 1966 about 10:45 P.M. Arion England, 19 years of age, was going home from a party when he met the appellant and one Eric Johnson outside a bar at Gold Street and North Avenue.[1] He testified that they remained in the vicinity about an hour and fifteen minutes "standing around, boxing (and) playing," with several other boys. About midnight England, Johnson and the appellant went to a party at a girl's house on Whitelock Street. At one time, while at the party the appellant and Johnson left to go to a liquor store. When they came back they had "some (paper) bags" and asked England if he wanted a drink but he refused. About 12:30 A.M. England told the appellant and Johnson that he was going home and they told him they were leaving also and the three boys left together. They went to North and Linden Avenues and were on the sidewalk with some other boys outside the Golden Pen Pixie Shop. Finally two policemen told them to leave and after some discussion

---

1. Johnson was indicted with the appellant but on August 26, 1966 by appropriate order was transferred to Clifton T. Perkins State Hospital for examination. The record indicates that the determination by the hospital physicians that he was sane at the time of the commission of the crime and sane at the time of his examination was not made until after the trial of the appellant. Thus, they were not jointly tried.

England, Johnson and the appellant walked down the street a "little after one" A.M. They went to a Little Tavern, "seven or eight doors" from the Pixie Shop and bought some hamburgers and soda. When they left the Little Tavern the same two policemen who had talked to them before were outside. The appellant stopped and "looked at the police kind of hard" until England told him to "come on." England, Johnson and the appellant walked on Linden Avenue toward Presstman Street. They walked to the 1900 block Eutaw Place and saw a man, later determined to be Oscar Lewis, staggering across the street. At that time they were 30 to 40 feet behind the man. England then testified:

"Eric Johnson took a look at Brooks and Brooks looked back at him, and Eric Johnson ran down and grabbed the man from the back and hit the man, turned the man around from the back, and hit him." His further testimony explained that Johnson grabbed the man across the shoulders, spun him around and hit him with his fist in the face. Then the appellant "ran in and hit the man" in the face with his fist and the man fell to the ground by the gutter. Johnson then got on top of the man, kneeling on the man's arms and started beating him. The appellant was leaning over them about 18 inches away. England was "up the street" about 20 feet away, "scared" because of what the appellant and Jonhnson were doing. A woman at a window in a house in front of which the incident occurred "hollered for the police" and screamed "Get off that man" and England ran. As he started to run the appellant "was still standing over top of the man and Eric Johnson still on the man." Then the appellant and Johnson also ran catching up to England at Madison Avenue and Robert Street. They walked across Madison Avenue and Johnson "hollered 'Police' " and all three began running again, westbound on Robert Street toward Druid Hill Avenue. They walked up Druid Hill Avenue toward North Avenue and Johnson showed his hand, which had blood on it, to England. The woman at the window was Mrs. Rena Lovelace who resided at 1902 Eutaw Place. She testified that she was at her bedroom window on the second floor when she saw a man come out of a house across the street. He was walking down the street with his hands in his pockets. Two boys were walking

"in the back of him a good little ways from him, and all of a sudden they walked up on him * * * Just as they got right in front of my door they caught up with him right fast and when they caught him they shoved him * * * He fell out in the street. He said, 'You all leave me alone, I doesn't have anything' * * * he said that twice." One of the boys jumped on him and put his knee on him. That boy "pulled something out of his pocket and stabbed him real fast." The other boy was very close, about two feet away. She saw "blood coming up real fast, spurt from him." She screamed for them to leave the man alone and for the police and they started running toward Madison Avenue. One of the boys had on a light trench coat with a belt in the back and one was taller than the other. She called her daughter and they went out and saw the man lying in a pool of blood. They stayed there until the police arrived. The testimony of Officer George Guest and Officer Paul Page of the Baltimore City Police Department was substantially the same as that of the witness England as to the occurrences in the vicinity of the Pixie Shop and the Little Tavern. Each identified the appellant as one of the boys they saw at that time. Each recalled that the appellant was wearing a white or light tan trench coat with a belt in the back. The appellant was taller than the other two boys with him. As a result of information with regard to a homicide in the 1900 Eutaw Place received over the police call-box about 3:00 A.M., the officers patrolled the neighborhood looking for the three boys they had seen earlier that morning. About 5:15 A.M. they saw Johnson and the appellant on Eutaw Place near Robert Street and arrested them. The defendant did not take the stand. The autopsy performed on Oscar Lewis, who was taken from in front of 1900 Eutaw Place, and pronounced dead on arrival at the Provident Hospital at 2:00 A.M. on March 12, 1966 disclosed that the blood alcohol content of the deceased was 0.22 per cent and that there were nine stab wounds in his head and neck. It was the opinion of the Medical Examiner that the deceased died of aspiration of blood from a stab wound of the neck and that the manner of death was homicide.

It has been clearly established that the test of the sufficiency of the evidence in a case tried before the court without a jury, when reviewed by this Court, is whether the evidence, if believed,

either shows directly or supports a rational inference of the facts to be proved, from which the court could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged. *Fisher v. State*, 1 Md. App. 505 and cases therein cited. Maryland Rule 1086, providing that when a case has been tried by the lower court without a jury, this Court will review the case both on the law and the evidence, also provides that the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses.

We think that the evidence would at least support an inference that there was an attempt to rob the deceased. There was no evidence of an argument or altercation before the brutal assault, that there was ill-will between the deceased and his assailants or in fact that he even knew them, or that the assault was provoked by other than an attempt to rob. The attack was from the rear and began by grabbing the victim by the shoulders to spin him around and by blows to the face. Although, if any words were spoken by the assailants, they were not overheard, the victim cried out on two occasions, "You all leave me alone, I doesn't have anything." The purpose of the assailants was not completed only because of the intervention of Mrs. Lovelace. The incident followed the all too familiar pattern of a typical yoking of a drunken man, but with murder as the end result. We cannot say, on review of all the evidence before the trial court, that its finding that there was an attempt to rob the deceased was clearly erroneous. The argument of the appellant that the crime, at best, was assault with intent to rob has no merit. Assault with intent to rob may also be an attempted robbery. *Clark and Marshall, Crimes*, 6th Ed. § 4.07, p. 218. In *Hart v. Warden*, 213 Md. 658 the docket entries showed that the defendant was convicted of "assault to rob with a deadly weapon." He was sentenced to a term of 15 years. He correctly contended that the maximum sentence by statute for the crime of assault with intent to rob was 10 years. The first count of the indictment under which he was tried read, in part that, he "with a certain dangerous and deadly weapon * * * And upon one Albert Lane, feloniously did make an assault, with intent

then and there him the said Albert Lane in bodily fear and danger of his life then and there feloniously to put, and certain monies * * * of the said Albert Lane then and there being, from the person and against the will of the said Albert Lane then and there feloniously and violently to steal * * *." The second count read the same with the omission of "with a certain dangerous and deadly weapon." The form of indictment prescribed by statute for the crime of attempt to rob with a dangerous and deadly weapon is a formula substantially that the accused "* * * feloniously * * * did attempt with a dangerous and deadly weapon to rob C-D and * * * violently did attempt to steal from him * * *." The Court found that it was evident that the defendant was convicted of attempt to rob with a dangerous or deadly weapon under the first count and was not convicted under the second count which "was evidently the charge" under the statute with regard to the offense of assault with intent to rob. As the maximum sentence for attempted robbery was 20 years the sentence of 15 years was within the maximum.

The trial court found that the appellant participated in the attempt to rob, that he embarked on a common design with Johnson to rob the deceased "and in pursuance of this common design he struck the victim" and that both the appellant and Johnson attempted to rob the deceased. The appellant and Johnson had been in the company of each other for several hours immediately preceding the assault. When they saw Lewis, Johnson looked at the appellant and the appellant looked back at Johnson and both ran to the victim. Johnson grabbed Lewis, spun him around and hit him. The appellant then hit him and knocked him down. The entire time Johnson was stabbing Lewis, the appellant stood right over them. When prevented from completing the robbery they fled together and were apprehended some three hours later still in the company of each other. It is obvious that the appellant was not an innocent bystander. It is difficult to believe that the appellant would not have shared in the loot if they had been successful in stealing money or goods from their victim. Even if it be assumed that the appellant's mere presence would not be sufficient to make him a participant in the killing and even if the appellant did not participate

in the actual killing or did not know that a killing was to take place, the trial court found that he participated in an attempt to perpetrate a robbery during which a murder occurred and that is enough, under the statute to support a verdict of guilty of murder in the first degree. See *Shockley v. State,* 218 Md. 491 and *Stansbury v. State,* 218 Md. 255. We think there was sufficient evidence, or inferences from evidence, to support the finding that the appellant participated in the attempted robbery, and we cannot hold that the trial court was clearly wrong in so finding. The conviction of murder in the first degree was proper.

Since there was an attempted robbery participated in by the appellant and since there was credible evidence that a deadly weapon was used in the attempt, a weapon, the use of which inflicted a stab wound on the victim causing his death, the conviction of attempted robbery with a deadly weapon was also proper.

*Judgments affirmed.*