JACKIE C. PARKER *v.* STATE OF MARYLAND

[No. 414, September Term, 1968.]

*Decided June 6, 1969.*

168

The cause was argued before MURPHY, C.J., and AN-DERSON, MORTON, and ORTH, JJ.

*L. Edgar Brown* and *William D. Simpson* for appellant.

*Donald Needle, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *William B. Yates, II, State's Attorney for Dorchester County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The appellant was convicted on 16 May 1967 by a jury in the Circuit Court for Wicomico County of first degree murder and robbery with a deadly weapon. He was sentenced to life imprisonment on the murder conviction and to a twenty year term on the robbery conviction, to run consecutively with the life sentence. The appellant's principal defense at that trial was that he was insane at the time of the commission of the crime, the test of criminal responsibility then prevailing being the M'Naghten-Spencer test. On appeal we reversed the judgments and remanded the case for a new trial because the lower court had erroneously charged the jury that the burden of proof was upon the defendant "to establish insanity by a preponderance of the evidence; but then the burden then shifts to the State to prove beyond a reasonable doubt that he was sane." *Parker v. State,* 4 Md. App. 62. By order of the Circuit Court for Wicomico County of 26 June 1968 the case was removed for trial to Caroline County upon suggestion of the appellant. The appellant went to trial on 21 August 1968 before a jury on pleas

of not guilty and that he was insane at the time of the commission of the alleged crimes. The verdicts of the jury were that he was sane at the time of the commission of the crimes, that he was guilty of murder in the first degree without capital punishment and that he was guilty of robbery with a deadly weapon. The sentences of the court were that on the murder conviction he be committed to the jurisdiction of the Maryland Department of Correction for confinement for the balance of his natural life and on the robbery conviction that he restore the property taken or pay the full value thereof to the owner and be committed to the jurisdiction of said Department for confinement for 20 years to run consecutively with the life sentence.

## VOLUNTARY INTOXICATION AND INSANITY

At the time of the appellant's trial on remand, the responsibility for his criminal conduct, raised by his special pleas, was no longer to be determined by the M'Naghten-Spencer test, but by the test prescribed by Chapter 709, Acts 1967, codified as Md. Code, Art. 59, § 9(a). We discussed this new test and the procedure to be followed when it is invoked, in *Strawderman v. State*, 4 Md. App. 689. The lower court correctly followed the procedure and properly permitted the issue of the appellant's sanity to go to the jury. The appellant contends, however, that the court erred in instructing the jury with regard to the issue.

In its advisory capacity the lower court read the jury Art. 59, § 9(a) and explained it, thoroughly and correctly. Part of the appellant's defense was that he was intoxicated at the time of the commission of the crimes. The court said:

> "In respect to the contention of the accused
> that he was intoxicated at the time of the commission of the crimes charged, which condition
> he alleges contributed materially to his insanity, the jury are advised that you should inquire

whether the accused lacked completely the mental ability and willpower to abstain from taking the first drink on December 30, 1966. If you find that he did lack such ability and willpower and further find that after taking the first drink he further lacked the mental ability and willpower to abstain from continued drinking until he reached a state of intoxication, then under those circumstances, his ultimate intoxication would be deemed involuntary and therefore should be considered together with all other evidence in determining his sanity or insanity under the test provided by law."

The court continued, and it is this part of the charge which the appellant challenges on appeal and preserved for review by timely exception below:

"On the other hand, if the jury find either that the accused had sufficient mental ability and willpower to abstain from taking the first drink on December 30th, or that after taking the first drink he possessed the mental ability and willpower to abstain from continued drinking to the point of intoxication, then in the event of either of these conditions, his ultimate intoxication would be considered voluntary under the law, and therefore, could not of itself or even when considered together with existing mental conditions, which were in and of themselves insufficient to produce a lack of substantial capacity, constitute a grounds for finding that the accused lacked substantial capacity at the time of the alleged crimes so as to make him insane under the law. The State contends, however, that the accused was not intoxicated at the time of the alleged crimes, and if you find this contention to be true, then of course, you need not concern yourselves with the effect of his intoxication upon his sanity."

The appellant argues that "the effect of this instruction was that (he) could not be found insane if voluntary intoxication caused or contributed to a mental disease or defect which in turn caused (him) to lack the substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. In other words, the jury was instructed that even though they found that the appellant was insane as defined by Art. 59, § 9(a) * * * they must find him legally sane if his insane condition was caused or contributed to by voluntary intoxication." He urges: "Since insanity relates to a person's capacity to commit a crime, it is immaterial what caused the insanity. The only issue should be whether or not (he) was insane at the time of the commission of the alleged crime under the applicable legal test of insanity. If he was, he was incapable of committing a crime and why he was incapable is not material. Although voluntary intoxication is not normally a defense to crime, if insanity results from the voluntary intoxication, the insanity is a complete defense, the same as insanity produced by any other cause."

The State counters this argument by asserting that voluntary drunkenness resulting in insanity excuses criminal conduct only when the insanity is permanent, that is a settled or fixed insanity, as distinguished from a temporary insanity. It claims that by the weight of authority temporary insanity from the voluntary use of intoxicants is rejected as a defense for the commission of a crime.

There was expert testimony, as characterized in the appellant's brief, that the appellant had a chronic brain syndrome or organic brain damage and character behavior disorder (classified by one expert as a mental defect). However, these, in themselves, did not cause the appellant to lack "substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." But the ingestion of alcohol on the day of the offense produced an acute brain syndrome and this mental defect, so produced, rendered the appellant insane at the time of the commission of the of-

fenses as defined by the statute. Since the appellant would have been sane at the time of the commission of the crimes, although suffering from a mental disease or defect, and became insane only by reason of his drinking, the question is squarely put—whether, upon a finding by the jury that the drinking by the appellant on the day of the crime was voluntary, it could not consider such drinking, "of itself" or with the pre-existing mental disease or defect, in its determination of the issue of his insanity?

We note at the outset that Md. Code, Art. 59, § 9(a) does not expressly relate to the cause of insanity as therein defined except in negative terms: "The term, 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." We note further that there is no statute in Maryland pertaining to intoxication as affecting criminal responsibility. However it is the established rule of law in this State that voluntary drunkenness is not a defense to crime, although whenever the actual existence of any particular motive, purpose or intent is a necessary element to constitute any particular species or degree of crime, the trier of fact may take into consideration the fact that the accused was intoxicated at the time in determining the purpose, motive or intent with which he committed the act. *Michael v. State,* 1 Md. App. 243.

The great weight of authority is in accord with the rule as stated in *21 Am. Jur. 2d, Criminal Law,* § 44, p. 128:

> "It is well settled that temporary insanity which arises from present voluntary intoxication is no defense. This is true even though the defendant's temporary state of mind may meet the requirements of legal insanity contained in the M'Naghten rule, or whatever test of criminal responsibility is applied in the particular jurisdiction. On the other hand, if the accused was suffering from a settled or fixed insanity,

even though caused by long-continued alcoholic indulgence, the rule is the same as in the case of insanity arising from any other cause. If the test of criminal responsibility locally applied is met, a settled or fixed insanity is a defense, even though it may have had its origin in long-continued voluntary intoxication, and regardless of whether defendant was under the influence of liquor at the time of the particular act."

Weihofen in *Mental Disorder as a Criminal Defense*, p. 124, states:

"The courts have drawn a distinction between intoxication, the immediate effect of indulgence in acoholic spirits, and insanity, resulting from long continued habits of imbibing alcoholics. Voluntary intoxication, it is generally agreed, is no excuse for crime; and in most states, this is true even though the intoxication may result in temporary insanity, rendering the person for the time unconscious of his acts, or incapable of distinguishing right from wrong."

The rule is summarized in 8 A.L.R. 3d, *Voluntary Intoxication—Defense:*

"Despite extensive developments in psychiatric research, widespread changes in social, medical, and legal attitudes toward alcoholism, and intense debate as to legal tests of mental responsibility of those charged with crime, the law with respect to the effect of voluntary intoxication upon criminal responsibility has shown little tendency to change or develop. The legal rules governing the question were early settled and may be briefly stated: intoxication, if voluntarily incurred, no matter how gross, is ordinarily no defense to a charge of crime based upon acts committed while intoxicated. (except as to specific intent crimes where the intoxica-

tion is such as to negative the intent) * * * It is apparently only when the alcoholism produces a permanent and settled insanity distinct from the alcoholic compulsion itself that the law will accept it as an excuse." § 2, p. 1239.

"Permanent insanity, although produced by the use of intoxicants, is treated as any other insanity and is a defense to the commission of a crime." § 6(a), p. 1265.

"Alleged temporary insanity resulting from the use of intoxicants has frequently been rejected as a defense, the courts treating this as merely having the effect of simple voluntary intoxication." § 6(b), p. 1267.

Rules as to insanity and drunkenness appear early in the law. Blackstone in his *Commentaries on the Law* (Gavit Ed.) said as to idiots and lunatics, Book 4, ch. 2, p. 760:

"The defect of will, which excuses crimes, arises from a defective or vitiated understanding. In criminal cases, idiots and lunatics are not chargeable for their own acts, if committed when under these incapacities; no, not even for treason itself. * * * As to voluntarily contracted madness by intoxication, which depriving men of their reason, puts them in a temporary frenzy, our law looks upon this as an aggravation of the offence, rather than as an excuse for criminal misbehavior. Coke asserts, that a drunkard has no privilege thereby, but what hurt soever he does, his drunkenness aggravates it." [1]

---

1. Blackstone continues: "The use and abuse of strong liquors depend much upon the temperature of the climate. The same indulgence which is required to make the blood move in Norway, would make an Italian mad. A German, says Montesquieu, drinks through custom founded upon constitutional necessity; a Spaniard drinks through choice, out of the mere wantonness of luxury; and drunkenness ought to be more severely punished, where it makes men mischievous and mad, as in Spain and Italy, than where it only renders them stupid, as in Germany and more northern

Lord Hale, in 1 *Pleas of the Crown,* Ch. IV, pp. 29-33 (1847) recognized three types of "idiocy, madness and lunacy" under the general name of "dementia." [2] The third type was "dementia affectata, namely drunkenness."

"This vice doth deprive men of the use of reason, and puts many men into a perfect, but temporary phrenzy; and therefore, according to some Civilians, such a person committing homicide, shall not be punished simply for the crime of homicide, but shall suffer for his drunkenness answerable to the nature of the crime occasioned thereby; so that yet the formal cause of his punishment is rather the drunkenness,

countries. * * * In the warm climate of Greece, a law of Pittacus enacted that he who committed a crime when drunk, should receive a double punishment; one for the crime itself, the other for the ebriety which prompted him to commit it. The Roman laws made great allowance for this crime. But the law of England, considering how easy it is to counterfeit this excuse, and how weak an excuse it is, will not suffer it to palliate a crime." pp. 760-761.

2. The first was idiocy, which as described by *Fitzherbert,* was "one who knows not to tell 20's, nor knows who is his father or mother, nor knows his own age; but if he knows letters, or can read by the instruction of another, then he is no idiot. * * * These, though they may be evidences, yet they are too narrow, and conclude not always, for *idiocy or not* is a question of fact triable by jury, and sometimes by inspection." The second was "accidental dementia" that "which proceeds from several causes; sometimes from the distemper of the humours of the body, as deep melancholy or adust choler; sometimes from the violence of a disease, as a fevor or palsy; sometimes from a concussion or hurt of the brain, or its membranes or organs." He recognized two types of insanity, partial and total. As to partial insanity he found it very difficult to define the invisible line that divides perfect and partial insanity and that "such a person as labouring under melancholy distempers hath yet ordinarily as great understanding as ordinarily a child of fourteen years hath, is such a person as may be guilty of treason or felony." As to total insanity, or absolute madness, "this excuseth from the guilt of felony and treason." He noted that accidental dementia is distinguished "into that which is permanent or fixed, and that which is interpolated, and by certain periods and vicissitudes: the former is phrenesis or madness; the latter is that, which is usually called lunacy." Those committing a crime while under the "distemper" are "under the same judgment as those suffering from partial insanity according to the measure or degree of their distemper." pp. 29-31.

than the crime committed in it: but by the laws of England such a person shall have no privilege by this voluntary contracted madness, but shall have the same judgment as if he were in his right senses. But yet there seems to be two allays to be allowed in this case. 1. That if a person by the unskillfulness of his physician, or by the contrivance of his enemies, eat or drink such a thing as causeth such a temporary or permanent phrenzy, as aconitum or nux vomica, this puts him into the same condition, in reference to crimes, as any other phrenzy, and equally excuseth him. 2. That although the simplex phrenzy occasioned immediately by drunkenness excuse not in criminals, yet if by one or more such practices, an habitual or fixed phrenzy be caused, though this madness was contracted by the vice and will of the party, yet this habitual and fixed phrenzy thereby caused puts the man into the same condition in relation to crimes, as if the same were contracted involuntarily at first." pp. 31-33.

Thus Hale, as the law does today, distinguished between temporary insanity caused by voluntary drunkenness and that caused by involuntary drunkenness and he recognized that permanent insanity, even though caused by voluntary drinking, excused the commission of a crime.

The rule of law with respect to responsibility for criminal conduct as affected by voluntary intoxication which has been consistently followed by the majority of courts in the United States is substantially that stated by Lord Hale. Regardless of what test is applicable to determining insanity, the majority distinguish between (1) the mental effect of voluntary intoxication which is the immediate result of a particular alcoholic bout; and (2) an alcoholic psychosis [3] resulting from long continued hab-

---

3. The term "alcoholic psychosis" has been defined as "Insanity due to alcohol," Davidson, *Forensic Psychiatry*, p. 316 (1952),

its of excessive drinking. The first does not excuse responsibility for a criminal act; the second may. In other words, if a person drinks intoxicating liquor and is sane both prior to drinking and after the influences of the intoxicant has worn off, but is insane by the applicable test while under the influence of the intoxicant, he comes under the first category. If he is insane whether or not he is directly under the influence of an intoxicant, even though that insanity was caused by voluntary drinking, he comes under the second category. The cases usually refer to the first category as a "temporary" insanity and the second category as a "permanent," "fixed" or "settled" insanity. These terms may be an oversimplification. What "permanent," "fixed" or "settled" means within the frame of reference is that the insanity not only existed while a person was under the influence of intoxicating spirits as an immediate result of imbibing, but existed independent of such influence, even though the insanity was caused by past imbibing. So if a person while in the throes of delirium tremens which may meet the test for insanity, commits a crime, he is not responsible for his criminal conduct, although such defect, resulting remotely from excessive drinking is only a temporary toxic state. It would seem that the distinction, notwithstanding the language of the cases, is not so much between temporary and permanent insanity as it is one between the direct results of drinking, which are voluntarily sought after, and its remote and undesired consequences. We adopt the majority view.

As example of cases in accord with the rule which we have adopted see: *United States v. Drew*, 5 Mason 28, United States Circuit Court for the District of Massachusetts (1828) ; *State v. Wilson*, 104 N. C. 868, 10 S. E. 315 (1889) ; *Kelly v. State*, 20 S. W. 357 (Texas 1892) ; *Evers v. State*, 31 Tex. Crim. 318, 20 S. W. 744

and as "grave mental disorder found in connection with excessive use of alcohol which was imbibed because of defective personality integration and resulting unsolved conflicts," Cavanaugh & McGoldrick, *Fundamental Psychiatry*, p. 426 (1958).

(1892); *State v. Kidwell,* 62 W. Va. 466, 59 S. E. 494 (1907); *Martin v. State,* 100 Ark. 189, 139 S. W. 1122 (1911); *Rucker v. State,* 119 Ohio 189, 162 N. E. 802 (1928); *Bryant v. State,* 122 Tex. Crim. 385, 55 S. W. 2d 1037 (1932); *State v. Rio,* 38 Wash. 2d 446, 230 P. 2d 308 (1951); *Griffin v. State,* 96 So. 2d 424 (Fla. App. 1957);[4] *State v. Clokey,* 83 Idaho 322, 364 P. 2d 159 (1961); *Couch v. State,* 375 P. 2d 978 (Okla. Crim. 1962); *McIntyre v. State,* 379 P. 2d 615 (Alaska 1963). Compare *People v. Cummins,* 47 Mich. 334, 11 N. W. 184 (1882).

The appellant quotes *21 Am. Jur. 2d, Criminal Law,* § 44, p. 128, in support of his argument. The first sentence of his quotation is the last sentence of the quotation we set out *supra* and is preceded by what goes before in our quotation. He continued the quotation as follows:

> "It is not necessary, however, that a mentally diseased condition brought on by voluntary use of intoxicants must have reached a permanent or incurable condition before the accused will be held irresponsible; on the contrary, such conditions as delirium tremens, or alcoholic hallucinosis, may be sufficient even if the condition was temporary."

This is in accord with the frame of reference in which we have considered "permanent" insanity and the cases cited in § 44 in support of the statement are not to the contrary. He also relies on *King v. United States,* 372 F. 2d 383 (D. C. 1967), quoting a part of the opinion. Aside from the fact that the point referred to in the quote was characterized by the court as one of "the other aspects of the case" which it remarked on "without indicating

---

4. The appellant cites *Griffin* in support of his argument. *Griffin* held, "Intoxication does not excuse or mitigate any degree of unlawful homicide, except murder in the first degree, unless, as a result of such intoxication, there be *a fixed or settled frenzy or insanity* either permanent or intermittent." 96 S. 2d 425. (emphasis added).

whether they would independently warrant reversal," we construe the language of the court as quoted to be in accord with our rule that voluntary drunkenness may be taken into consideration whenever the actual existence of any particular motive, purpose or intent is a necessary element to constitute any particular species or degree of crime. This is not in point in the question as presented by the appellant here. Nor is his reliance on *Dubs v. State*, 2 Md. App. 524 well placed. In *Dubs* the defendant took the position that if he was a chronic alcoholic, the rules of law as to voluntary intoxication were not applicable to him because then his drinking was involuntary. We rejected the argument, noting that the cases relied on in support of it applied to crimes which were acts compulsive as symptomatic of the disease of alcoholism. The court instructed the jury in part as follows:

> "Voluntary intoxication in itself is no excuse for the commission of a crime but may be taken into consideration by the jury along with other facts in determining the existence of a particular intent and also in determining whether an accused person at the time of the alleged crime, had the requisite mental capacity and the reason to enable him to distinguish between right and wrong and to understand the nature and consequences of his acts as applied to himself. This test, that is the mental capacity last mentioned, is the one and only test as to sanity in Maryland, whether the claimed insanity be alleged to be due to alcoholism, intoxication, or any other cause."

Within the factual posture of the case, our finding no error in that particular part of the instruction, considered in the light of the instructions as a whole, did not mean that we subscribed to the notion that involuntary intoxication as inducing "temporary" insanity as herein defined could be considered by the trier of fact on the issue of insanity. And even if it be so construed, there was no

error in the instruction requiring reversal, as the defendant received more than that to which he was entitled. And we think that *Parker v. State, supra,* in which we reversed the appellant's original conviction, cited by the appellant, is not inconsistent with our view herein expressed. There the evidence concerning the appellant's lack of criminal responsibility, unlike the instant case, was sketchy and the point was whether it was sufficient to permit the issue to go to the jury. We found that it was, the import of our holding being that from the evidence in that case presented the jury could have found that the appellant had a "permanent" insanity "brought on by ingestion of alcohol over a long period of time." In the instant case the expert witnesses called by the appellant in his own behalf testified that if he had not ingested alcohol on the day of the offense he would have been responsible for his acts. It appeared clear from the evidence that the appellant was not suffering from a "permanent" insanity.

The rule we have adopted may at first glance seem harsh. But as early as Blackstone the law would not allow voluntary drunkenness to palliate a crime, "considering how easy it is to counterfeit this excuse, and how weak an excuse it is." *Blackstone's Commentaries on the Law,* (Gavit Ed.) book 4, ch. 2, p. 761. And Lord Hale, recognized that the determination of incapacity by intoxication as causing insanity "is a matter of great difficulty, partly from the easiness of counterfeiting this disability, when it is to excuse a nocent, and partly from the variety of degrees of this infirmity, whereof some are sufficient, and same are insufficient to excuse persons in capital offences." But he justified the rule:

> "Yet the law of England hath afforded the best method of trial, that is possible, of this and all matters of fact, namely, but a jury of twelve men all concurring in the same judgment, by the testimony of witnesses *viva voce* in the presence of the judge and jury, and by the inspection and

direction of the judge." 1 *Hale, Pleas of the Crown,* ch. IV, pp. 32-33.

Alcoholism is looked upon today with more compassion than in Blackstone's time. The medical profession may consider acute alcoholism as a "disease" as have some courts as to acts compulsive as symptomatic of alcoholism. But it is not to disparage the medical profession and the psychiatric discipline, despite the extensive developments in psychiatric research and the widespread changes in social, medical and legal attitudes towards alcoholism, to say that the underlying rationale of the rule as early expressed and its justification over the years are still appropriate. It may be that "all alcoholism deviates from the norm of good health, but it is more likely to be in the nature of a character defect, for which the law holds the person responsible, than a mental disorder which the law recognizes as 'insanity.' " Weihofen, *Mental Disorder as a Criminal Defense,* p. 125. We believe it in the interest of public justice and not unfair to the individual, surrounded as he is with the safeguards in the procedures required in the determination of his responsibility, that he be held so responsible.

Applying the rule we have adopted to the challenged instruction, we have no difficulty in finding that it was proper. The charge of the lower court, going as it did to a temporary insanity as the immediate result of voluntary intoxication, was a correct statement of the law. There was no question raised as to the appellant's competency to stand trial, see Md. Code, Art. 59, § 7 and *Strawderman v. State, supra,* and the evidence was that he was sane while not under the influence of alcohol. That he had a mental disease or defect short of the applicable definition of insanity before he drank, and that this mental disorder may have had some consequential effect with the intoxicant so as to induce insanity are not material. Some individuals have a lower tolerance to alcohol than others for various reasons, reacting to even moderate amounts, but this plays no part in regard to their re-

sponsibility for their criminal conduct while voluntarily intoxicated.[5] We hold that the advice to the jury that if it found that the drinking by the appellant on the day of the crime was voluntary, it could not consider such drinking, of itself, or with pre-existing mental disease or defect, in its determination of the issue of his insanity was not error.

## THE READING OF THE DEFINITION OF INSANITY TO THE JURY

In its charge to the jury the court read Md. Code, Art. 59, § 9(a) verbatim to the jury. The appellant excepted to the inclusion of that part of the statute which provides:

"As used in this section, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

His exception was based on the ground that there was no evidence in the case that the accused was suffering from an abnormality manifested only by repeated criminal or otherwise antisocial conduct. His argument on appeal is

---

5. See note 1, *supra*. One of the expert witnesses testifying for the appellant, asked, "Everybody that gets under the influence of alcohol has acute brain syndrome?" replied, "Its a matter of degree. Some people can take a great deal more alcohol than others to get—you cannot say so many ounces. You also get some people that take very little. Then on others it takes a great deal * * * (As to acute brain syndrome) you can reach that point. Everyone can reach that point * * * If they are drunk where there is a memory loss, and where there is a lack of comprehension and judgment, I certainly feel there would be an acute brain syndrome." It was his opinion that if a normal person gets drunk enough he has an acute brain syndrome which is a mental illness—"Sometimes you hate to admit it, but it is." Asked whether a person with a chronic brain syndrome gets drunk faster because of it, he said, "You already have limited resources, mental resources, and when you impair—they are impaired already, yes, I imagine you could get it quicker and get it to a more severe degree." But it was elicited from him that this type of mental illness "would not keep a person from understanding the criminality and appreciating the criminality of his conduct or to conform his conduct to the requirements of law *per se*, meaning—there are many people with mental illnesses here that conform their conduct to the requirements of the law * * *."

in substance the same. In denying the exception the court said:

> "The Court overrules this exception for the reason that it is our belief that the question of whether such an abnormality as mentioned in the law does or does not exist is a question of fact for the jury's determination, and that there is sufficient evidence in this case to permit an affirmative finding on this point; that is, the testimony of some of the medical witnesses for the State testified to the effect that in their opinion the accused did not have either a mental disease or defect but did have a character or personality disorder, and was a chronic alcoholic and a habitually excessive drinker.
>
> We believe that these facts introduced in evidence are legally sufficient to permit and allow the jury to conclude that his habitual drinking without a mental disease or defect under these circumstances to be an abnormality as mentioned in the exceptions of the law; therefore, the exception is overruled."

In explaining the statute the court said:

> "In other words, if all that can be said about a person's mental powers and abilities is that he has been a persistent law-breaker or that he is disposed to repeated antisocial conduct, that obviously in and by itself offers no support for concluding that his law-breaking or antisocial conduct should be attributed to a mental disease or defect rather than simple viciousness of character."

We think the reasons given by the court in denying the exception were sound. His statements as to the facts are borne out by the record. In any event we think the jury were entitled to the entire definition of insanity. Their obligation was to determine whether or not the appellant was insane under the test prescribed by the legislature.

In so doing, as judges of the law and fact, they had to ascertain the intent of the statute and the challenged part is an integral element of what constitutes insanity, even though expressed in negative terms. It at least tends to explain the positive definition and the jury were entitled to have it. We find no prejudicial error.

## THE SEARCH AND SEIZURE

The appellant does not now contest the legality of his warrantless arrest; the lower court found that it was based on probable cause to believe that a felony had occurred and that the appellant committed it and from our review of the evidence we agree. Officer Edward M. Thomas testified that he received an order to go to the apartment of the appellant and keep it under surveillance. He did so. The Chief of Police, Brice Kinnamon, the Assistant Chief of Police, James C. Leonard, and Officer Harry Hansen arrived. He and Hansen received orders from Kinnamon to arrest the appellant and they went upstairs to the appellant's apartment. "As we approached the door * * * we knocked on the door two or three times loud, and advised whoever was in the apartment that it was the Cambridge Police Department. We got no response at that time." There was a glass pane in the door and with the aid of a flashlight they saw someone on the bed. They forced the door and entered. "We went directly to the bedroom where the defendant, Jackie Parker, was lying in bed, and he was arrested * * *." No one else was in the apartment. A few seconds later Leonard came in. The appellant was handcuffed and Kinnamon ordered that he be taken to the Dorchester County Jail.[6] "Right after that I was ordered to search the apartment * * *" by Kinnamon. The apartment, on the second floor of the premises, consisted of a kitchen, a dining room, two bedrooms and a bath. "As we were standing there we smelt smoke." The appellant had just left. The smoke came from the north bedroom (not the one

---

6. He was taken to the jail by Hansen and an Officer Green who had been at the foot of the stairs leading to the apartment.

in which the appellant was found) and Thomas, Leonard and Kinnamon went to that bedroom. A small rug next to the bed was on fire. Thomas got a glass of water and put out the fire. There was money on the top of the bed, underneath the bed and under the mattress. The money was put in a paper bag found in the kitchen. Kinnamon ordered him "to search for a possible gun in the apartment and Kinnamon and Leonard left. Thomas found a pistol, a .32 automatic, in the north bedroom in a laundry basket. Leonard testified that some of the money found "was loose and some was in wrappers * * * bank wrappers." The pistol was given to him by Thomas. It was "fully cocked—she was off safety * * * It had a clip and all in it."

We find that as the arrest was valid, the search of the apartment and seizure of the money and gun were reasonable as incident and substantially contemporaneous thereto. In ruling on the point below the trial court said:

> "I think the evidence shows on this point that there was nobody there (in the apartment) but him (the appellant) and that it was his home * * * We think that the fact that these premises were under his control, that at the time he was arrested permits their immediate search thereafter, and it's not necessary that he be physically present during the time the search is conducted."

We agree. See *Mullaney v. State,* 5 Md. App. 248, 260; *Lewis v. State,* 2 Md. App. 678.

### THE ADMISSIBILITY OF THE MONEY SEIZED

The appellant contends that even if the money were legally seized, testimony concerning it and photographs of it were inadmissible because "the State failed to identify or to connect the appellant with it." Kinnamon testified the money found consisted of two $50 packages of $1 bills contained in wrappers, three $250 packages of $5 bills contained in wrappers, thirty-six $20 bills con-

tained in a wrapper and there were twenty-three $1 bills and one $5 bill loose—a total of $1598. There were no "loose wrappers in the apartment." On cross-examination it appeared that there were also five $10 bills which the witness thought were wrapped with the $5 bills.

John Jacob Arnie, eleven years of age, the son of the murder victim, testified that the appellant came into the grocery store operated by his father at 105 Washington Street in Cambridge, Md. on 30 December 1966 about 9:15 P.M. He knew the appellant by his coming into the store on prior occasions. The appellant got a pack of cigarettes and "was looking all around the store." Two other customers were there and the appellant left. When the customers left the appellant "came back and wanted to see my father in the back—in the back part of the store * * * where the meat block was * * * Well, I was starting to count out the safe, and then I heard a shot go off, and then somebody said, "You're crazy!" And then I heard another shot, and then my Daddy said for me to run." The boy ran "out towards the corner of Race and Washington Streets." As for the money, he remembered that there "was at least one bundle of ones, which there are 50 ones in a bundle, * * * at least two bundles of fives, which is $250 in one bundle." There was more money but he did not remember how much it was. He had not finished counting the money. He met Wayne Willey who had stopped for a red light and told him "Jackie Parker had shot my father and he went towards the store, and I kept running" to Louise Nock's house. He went in and called the police, Mrs. Nock's husband also spoke to the police on the phone. Then the witness phoned his mother and returned to the store with Mr. and Mrs. Nock. When they arrived an officer was there. "I looked to see if the money was there but it wasn't * * * The paper money was gone" including the $5 bills and the $1 bills which were wrapped. When he had first started to count the money it was in the safe. While counting it he placed it on the floor. Only he and his father and the appellant were in the store at the time of the shooting.

The wife of the deceased saw her husband in the hospital. Inside his shirt was a money bag covered with fresh blood—"and it had a hole that goes all the way through—and it contained paper money and a little bit of silver—less than seven dollars." The exact amount in the bag was less than $300. Her husband only wore the money bag "when he would go to the Union Trust Bank to carry checks, to get them cashed. You see, the store was known as a place for getting your checks cashed. So it was nothing unusual for him to go to the bank two or three times a day, and he would take these checks and have them cashed." There were not two packs of $5 bills in the bag but there were two packs of $1 bills. Marvin E. Green testified that he saw the appellant, about 9:45 P.M. on 30 December 1966 less than "a fourth of a city block" from the grocery store, running across the street; he had a gun in his hand. He followed the appellant and saw him enter the yard of his house. He returned to where he first saw the appellant and met a police officer. He told the officer what he had observed.

It is established that only the probability of connection with the accused or the crime is required for the admission of evidence. Lack of positive identification goes to the weight of the evidence not to its admissibility. *Hall v. State,* 5 Md. App. 599; *Jordan v. State,* 4 Md. App. 349; *Veihmeyer v. State,* 3 Md. App. 702; *St. Clair v. State,* 1 Md. App. 605; *Stewart v. State,* 1 Md. App. 309. We think that the evidence here established that money had been stolen from the store and showed the probability that the money found in the appellant's apartment was the money so stolen. As it was in the appellant's apartment, its connection with him was apparent in the circumstances. There was no error in its admission into evidence as contended by the appellant.

### THE ADMISSION OF ALLEGED HEARSAY STATEMENTS

Mrs. Arnie [7] saw her husband at the hospital less than

7. At the time of the trial she had remarried and was known as Grace Arnie Swain.

an hour after the shooting. She received the call from her son about 9:40 or 9:45 P.M. and arrived at the hospital at 9:50 P.M. "I walked in immediately to the emergency room where my husband was on a stretcher in the emergency room, and Dr. Wolff, two nurses and two orderlies were in his room." A few minutes later Dr. Burdette came in. Her husband was receiving oxygen by a face mask. She approached him and grabbed his hand. Asked if he said anything to her she said, "Yes." The court admitted in evidence that the victim said to his wife that he was going to die and that Jackie Parker shot him.[8] The court overruled objection to the admission of the testimony made on the ground that the statement was hearsay, stating, "Well, we believe that the evidence shows that this was sufficiently under the immediate excitement of the incident to be an exception." We agree. We discussed at length what evidence constitutes *res gestae* in *Hall v. State,* 5 Md. App. 599, 603-608 and find that the challenged statement here was properly admitted as being part of the *res gestae* under the principles therein set forth.

The victim made another statement. This one was to a police officer, Leonard, and was made approximately ten minutes and not more than fifteen minutes after the statement above discussed. The wife of the victim testified that Leonard came into the emergency room and "he asked could he talk to William Arnie and no one answered * * * My husband turned his head * * * He spoke directly to him (Leonard), he knew him personally, and he said, 'Hi, Jim. It was that Jackie Parker, the one you have already had so much trouble with, that shot me. He said, Your money or your life.' " [9] During the interval between the first and second statements the victim

8. She also testified that her husband said that Parker said, "Your money or your life." This was stricken by the court on the ground that it had not been disclosed by the State in answer to a motion for discovery.

9. It appears from the record that the statement made by the appellant to the victim—"Your money or your life"—was disclosed in the answer to the motion for discovery with respect to the statement made by the victim to Leonard.

was in the emergency room. "He was getting an intravenous feeding, and the personnel from the lab. came in to do a complete blood count, type and match." No sedatives or anesthesia or "anything of that sort were administered to him." She was present the entire time. The court admitted the statement over objection "because it is part of the *res gestae,* and also because it was in the nature of a dying declaration."

Leonard testified with respect to the statement made by the victim to him. His testimony was in substance the same as that of Mrs. Arnie. He said, "Mr. Arnie turned his head and said, 'Jim, Jackie Parker said, Money or your life,' and he shot me. You know who I mean? It's the Parker boy that you all have had trouble with. At that time he turned his head back. There was no more words said. I walked out. He was in right much pain." The testimony was admitted over objection on the ground that it was a part of the *res gestae* and a dying declaration.

We agree that the statement made by the victim to the police officer was part of the *res gestae* and find no error in its admission through the testimony of Mrs. Arnie and through the testimony of Leonard. See *Hicks v. State,* 3 Md. App. 225, 231. It may be that the statement to Mrs. Arnie and the statement to Leonard was admissible also as a dying declaration, but having found them admissible as part of the *res gestae* we do not reach that point. But see *Connor v. State,* 225 Md. 543, 550-554.

### THE SUFFICIENCY OF THE EVIDENCE TO SUSTAIN THE CONVICTION OF ROBBERY WITH A DEADLY WEAPON

The appellant contends that there was no evidence sufficient to establish he took and carried away any personal property of the victim.

It was clearly established by the evidence that it was the appellant who shot the victim. The only persons in the store at the time of the shooting were the victim, the

victim's son and the appellant, who was positively identified in court by the son. The appellant was identified as running from the scene immediately after the shooting with a gun in his hand. The cause of the victim's death was inflammation of the abdominal cavity as a direct result of bullet injuries. An expert witness testified that two spent bullets found in the grocery store had been fired from the pistol found in the appellant's apartment. Two cartridge cases found in the store were identified as having been fired from the pistol. On this evidence the *corpus delicti* of the murder and the criminal agency of the appellant as the murderer were proved. We think that the *corpus delicti* of the robbery and the criminal agency of the appellant as the robber were proved by the evidence above summarized and by the testimony of the victim's son concerning the money he was counting immediately before the shooting which was missing when he returned, by the testimony as to what the victim asserted was said to him by the appellant at the time of the shooting and by the money found in the appellant's apartment. *Jordan v. State,* 4 Md. App. 349 is dispositive of the appellant's argument that the money found in his apartment was not shown to be the same money as that taken at the robbery.

Our function on appellate review with respect to the sufficiency of the evidence in a jury trial, when the point is properly preserved, as it was here, is to determine whether the evidence was properly submitted to the jury. Applying the test of sufficiency stated in *Williams v. State,* 5 Md. App. 450, we find that the evidence either showed directly or supported a rational inference of the facts to be proved—that the appellant robbed William Arnie with a deadly weapon and stole money from him— from which the jury could fairly be convinced, beyond a reasonable doubt, of the appellant's guilt of robbery as charged. There being such evidence, the denial of the motion for judgment of acquittal was not erroneous.

## THE DENIAL OF THE MOTION FOR
## A MISTRIAL

Prior to trial the appellant filed a "Motion in Liminii" that the State or its witnesses not mention in any manner to the jury that he had been previously tried and convicted of the crimes. The motion is part of the record but the order attached to it was not signed by the lower court. In his brief the appellant states that it was denied. He asserts in his brief that at a pre-trial conference the court instructed the State to make no mention of these matters and to so instruct his witness. The proceedings at this pre-trial conference are not part of the record before us. During the examination of Leonard, called by the State, the State offered the clip which was in the pistol found in the appellant's apartment. The transcript reads:

"THE COURT: How do you know that's the same clip? Did you mark it some way?

MR. YATES (State's Attorney): I was going to ask him that.

BY MR. YATES:

Q. How do you know it's the same clip?

A. This here I had it marked. This—the court has put marks on this since that time.

Q. You are saying you had it marked before—

A. At the—

Q. —The Clerk of the Court of Appeals got hold of it?

A. That's right.

MR. SIMPSON (Defense Counsel): I object. Your Honor, I am going to move that a juror be withdrawn and a mistrial declared because of this intentional violation of the court's instructions.

THE COURT: We overrule the motion. Ladies and gentlemen of the jury, we are going to

strike out of the record any reference to the Court markings on that article. Disregard that, please.

And we caution you not to do that again, Mr. Yates.

MR. YATES: Yes, sir.

THE COURT: Disregard that, ladies and gentlemen. It has nothing to do with this case whatsoever."

At the close of all the evidence, out of the presence of the jury the court noted for the record:

"The Court inquired of counsel in the presence of the accused whether it was desired to include in the instructions that while it has been brought out in the evidence that there was a previous trial in respect to these charges, no significance should be attached to such fact, that the jury should decide the case from the evidence presented and that alone. Counsel for the accused has requested that no reference to the prior trial, or an explanation, be made."

The State indicated its agreement.

We said in *Baldwin v. State*, 5 Md. App. 22 at 28:

"The granting of a mistrial is an exercise which rests within the discretion of the trial judge. A mistrial should be granted only where plain and obvious reasons exist, upon the greatest caution and under urgent circumstances. Where, in the exercise of this discretion, the trial court refuses to grant a mistrial, such a decision will not be disturbed on appeal without giving full regard to the fact 'that the trial court is in an advantageous position to judge the question of prejudice, and its decision with reference thereto should not be reversed unless it is clear that there was prejudice.' " (citations omitted).

We do not believe that the reference by the State to the Clerk of the Court of Appeals prejudiced the appellant, especially in view of the prompt action by the trial court in instructing the jury to disregard it and considering the substance of the challenged remark. We do not find from the record that the question was framed as it was with a nefarious purpose by the State or with any calculated attempt to bring to the jury's attention that the appellant had been previously convicted, even if it be assumed that the question in fact so indicated to the jury. We cannot say that the court abused its discretion in the finding inherent in his denial of the motion that the appellant was not so prejudiced as to compel a mistrial. "Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. 'A defendant is entitled to a fair trial but not a perfect one.' *Lutwak v. United States,* 344 U. S. 604, 619 * * * It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information." *Bruton v. United States,* 391 U. S. 123, p. 135. The context presented in the instant case was not one in which the risk that the jury would not, or could not, follow instructions was so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system could not be ignored. We hold that there was no error in the denial of the motion for mistrial.

## MERGER OF OFFENSES

The appellant urges that upon his conviction of murder in the first degree under the first count of the indictment the charge of robbery with a deadly weapon under the second count merged therein; therefore the judgment under the second count should be vacated. We have discussed the principles as to the modern concept of merger of offenses in a number of cases, the true test being whether one crime necessarily involves the other. We rec-

ognized that a person should not be punished for the same acts whether the offenses charged by reason of such acts be deemed to be inconsistent, duplicitous or to have merged. See *Tender v. State,* 2 Md. App. 692, 700. In the charge to the jury the lower court said:

"In respect to the charge of murder in the first degree, the jury are instructed that under the law of this State, the unlawful killing of a human being by another human being is a matter of law presumed to be murder in the second degree and the burden is upon the State to prove the existence of deliberation and premeditation in order to raise the crime to first degree and is upon the accused to prove extenuating circumstances such as that killing was committed in the heat of passion, provoked by adequate provocation, to reduce the grade of the crime to manslaughter. In respect to these matters, however, the jury are further instructed that except for the evidence which tends to show that the shooting was committed in the perpetration of or attempt to perpetrate a robbery as hereafter referred to, there is no other legally sufficient evidence to permit a finding of elements necessary to raise the offense to first degree murder; neither is there any legally sufficient evidence to permit a finding that the killing was under extenuating circumstances sufficient to reduce it to manslaughter. Therefore, the jury are instructed that under the evidence in this case, the possible verdicts which can be found under the first count are murder in the first or second degree, or not guilty."

It defined robbery and continued:

"If the jury shall find all of these elements to have been established beyond a reasonable doubt, they would be justified in finding that a robbery had been committed. If they so find and

shall further find that in the course of perpetrating such robbery, the accused shot the deceased and as a direct result of such shooting the deceased died within a few days thereafter, then and in that event, under the law of this State, the accused would be deemed guilty of murder in the first degree, irrespective of whether he had any actual intent to kill the deceased."

By its remarks on the evidence in the case, the lower court limited a finding of murder in the first degree to the application of the felony murder statute.[10]

Md. Code, Art. 27, § 410, usually referred to as the "felony murder statute," provides:

"All murder which shall be committed in the perpetration of, or attempt to perpetrate, any rape, sodomy, mayhem, robbery, burglary, or in the escape or attempt to escape from the Maryland Penitentiary, the house of correction, the Baltimore City jail, or from any jail or penal institution in any of the counties of this State, shall be murder in the first degree." [11]

In addition to murder encompassed within § 410, murder shall be in the first degree when "perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing," § 407, or in the perpetration of or attempt to perpetrate, any arson, §

---

10. We note, contrary to the lower court's statement that "except for the evidence which tends to show that the shooting was committed in the perpetration of or attempt to perpetrate a robbery * * * there is no other legally sufficient evidence to permit a finding of elements necessary to raise the offense to first degree murder * * *," the statement of the appellant to the victim, "Your money or your life," followed by the shooting would seem to be sufficient evidence of deliberation, and premeditation, and wilfulness.

11. We have held that robbery with a deadly weapon, proscribed by Md. Code, Art. 27, § 488 does not create a new substantive crime of "robbery with a deadly weapon" but merely provides a penalty for the crime of robbery more severe when the robbery is committed with a dangerous and deadly weapon than when it is not. *Darby v. State*, 3 Md. App. 407, 412-414. Thus robbery with a deadly weapon is within § 410.

408, and in the burning or attempting to burn any barn, tobacco house, stable, warehouse, or other outhouse, no parcel of a dwelling house, having therein any tobacco, hay, grain, horses, cattle, goods, wares or merchandise, § 409. "All other kinds of murder shall be deemed murder in the second degree." § 411. In *Stansbury v. State,* 218 Md. 255, the Court said that §§ 407, 410 and 411 "* * * do not create any new crime, but merely classify murder, as it was known at common law, into degrees * * * At common law, a killing in the perpetration of a robbery was murder, regardless of intent * * * As used in the statute, the 'common law sense is left unimpaired; the measure of punishment only is sought to be graduated according to the circumstances under which it was committed * * *' It is perfectly clear that a finding either that the killing was wilful, deliberate or premeditated, or that it was in perpetration of a robbery, would support a verdict of first degree murder." at 260.[12] In *Robinson v. State,* 249 Md. 200, 207, the Court of Appeals stated that there were no decisions of that Court flatly supporting the contention that upon conviction of murder in the first degree by application of the felony murder statute, a charge of the felony which raised the murder to first degree was merged therein. It noted, note 1, p. 207 that it might be argued that in *Thompson v. State,* 230 Md. 113; *Ledbetter v. State,* 224 Md. 271 and *Lipscomb v. State,* 223 Md. 599, we have affirmed convictions of both the felony and the felony murder, but "the question here presented, however, seems not to have been raised in those cases." [13] We also affirmed such convictions

---

12. In *Halcomb v. State,* 6 Md. App. 32, although we found it not necessary to determine "whether the court * * * erred in instructing the jury, as it apparently intended to do, that it could consider the felony murder statute, in determining whether, had the officer been killed in the robbery, the appellant would be guilty of assault with intent to murder, regardless of his actual intent," we noted, in construing *Stansbury,* that we thought the rationale of its decision was "limited to cases involving a felonious homicide actually occurring in the course of a robbery." at pp. 43-44.

13. The question was left open in *Robinson,* the Court finding that there was evidence sufficient to sustain a conviction of murder in the first degree outside the felony murder statute. There,

in *Johnson v. State,* 4 Md. App. 648 and *Brooks v. State,* 2 Md. App. 291, but the question was not raised in those cases either.

We think that the doctrine of merger is not applicable here because murder and robbery are separate and distinct offenses. Murder is homicide committed with malice aforethought, *Perkins, Criminal Law,* (1957) ch. 2, § 1, p. 30; it is malice which distinguishes murder from manslaughter. *Stansbury v. State, supra,* 260. As "murder in the first degree" is not a crime as such but merely a classification of murder, that the status of a first degree classification may be attained by proof that the murder was committed during the perpetration of a robbery, does not make robbery an essential element of murder and it follows that murder does not necessarily involve robbery. Nor do murder and robbery arise from the same act; the act of taking property from a person by means of force and fear is separate and distinct from the act of firing shots that kill him, even though each is a part of one general transaction and even though evidence as to the robbery is admissible as to the murder. See *State v. Hall,* 383 P.2d 602 (Idaho); *Centers v. Commonwealth,* 318 S.W.2d 57 (Ky.); *State v. Barton,* 105 P.2d 63 (Washington); *State v. Moore,* 33 S.W.2d 905 (Missouri). *Ronzani v. State,* 24 Wis. 2d 512, 129 N.W.2d 143, cited by the appellant is not apposite. There the court found fundamental error when the defendant was convicted of both felony murder and the felony. But we think it clear that the court construed a statute making a death occurring during the course of a felony a distinct crime of "third degree murder" and that the underlying felony was an included crime within the meaning of that statute.

As the doctrine of merger is not here applicable, the conviction of robbery with a deadly weapon must stand.

*Judgments affirmed.*

---

however, the lower court's charge clearly permitted the jury to make a finding either by application of the felony murder statute or by reason that the murder was wilful, deliberate and premeditated.