

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JAMES MARCUS NEVES, | § | No. 08-24-00097-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 390th District Court |
| THE STATE OF TEXAS, | § | |
| | | of Travis County, Texas |
| Appellee. | § | |
| | | (TC# D-1-DC-21-206017) |

**<u>MEMORANDUM OPINION</u>**

A jury convicted Appellant James Marcus Neves of murder. In two issues, he argues the trial court abused its discretion in several evidentiary rulings and in failing to submit a jury charge on the lesser-included offense of manslaughter. In a third issue, he argues that—even if those trial errors are individually harmless—the cumulative effect of the errors casts a shadow upon the integrity of the verdict, entitling him to a new trial. For the reasons below, we affirm.[1]

---

[1] This appeal was transferred to this Court from the Third Court of Appeals in Austin pursuant to a Texas Supreme Court docket equalization order. Accordingly, we apply the Third Court of Appeals' precedent to the extent it conflicts with our own. *See* Tex. R. App. P. 41.3.

# I. BACKGROUND

On the evening of October 26, 2021, Vanessa Neves was shot and killed by her husband, James Marcus Neves.[2] Either a bullet to the back of her head or to her torso delivered the fatal shot. The fact that Neves fired a gun at Vanessa was not in dispute. Rather, his intent for doing so was a principal issue at trial. The jury found Neves guilty of murder under one of two theories: he intended to cause Vanessa's death intentionally or knowingly; or he intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused her death. In the punishment phase of the trial, the jury declined to find that Neves acted with sudden passion and assessed a 36-year prison term and a $10,000 fine. As background, we first recount the evidence relevant to the question of Neves's culpable mental state, which permeates the evidentiary challenges and the claimed charge error raised on appeal.

## A. The shooting on October 26, 2021

Neves lived with Vanessa and their two children in a two-story home. On the day of the shooting, their 13-year-old daughter, A.N., returned home from a school function around 7:00 pm.[3] Her father, Neves, was at home with her ten-year-old brother, S.N. Her mother had not yet returned from a book club meeting. A.N. and S.N. were in their upstairs bedrooms when Neves came up the stairs and ordered S.N. to go to bed, even though an hour remained before his bedtime. S.N. protested to his father and A.N. soon joined in the discussion. At that point, Neves mistakenly accused A.N. of stealing her brother's folder, though it actually belonged to her, and this too sparked an argument. A.N. and S.N. first thought Neves feigned his anger, that he merely appeared

---

[2] Because the couple share a surname, we will refer to Vanessa by her first name only and reserve the use of the surname to Appellant James Marcus Neves.

[3] To protect the children's privacy, we refer to them by their initials. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

"goofy," but their perceptions soon turned and the circumstance became more "real." They were soon scared of him. S.N. described Neves as becoming "red-faced" and "acting a little bit . . . strangely." A.N. recounted that Neves acted "strange" or "weird," which she attributed to his being drunk. She described his demeanor as being "confuddled" and not making sense. When they laughed at first, mostly because they didn't know what else to do, Neves "got really mad." He continued to say that A.N. had wrongfully taken S.N.'s folder, though the children disagreed. When A.N. returned to her room, Neves picked up a plastic bag from the floor and started chasing her and her brother. As he chased, he threatened to strangle A.N. with the bag that he held in his hand and shook at her as they ran.

A.N. and S.N. ran from room to room. They passed through a shared pass-through bathroom and locked each of the doors behind them. But Neves picked the locks and kept coming after them. Neves appeared "manic." He said things to the children like: "I'm going to hurt you;" and "I'm going to strangle you." At one point, A.N. hid in a storage closet of her brother's room. She overheard Neves telling S.N. that he would never succeed because of A.N., that she was the worst sister, and she would ruin his career and life. Suddenly, when Neves left the room and went back downstairs, the children took the opportunity to escape to the front yard of a neighbor's house. From there, A.N. phoned Vanessa and frantically told her what was going on with Neves. Vanessa said she would return home. When the children saw that Vanessa had returned, they came back to their residence. Vanessa and Neves were standing out front, with Neves claiming it was all a joke. Vanessa took the children upstairs calming them down, telling them she would take care of everything, and giving both of them a "long hug." Vanessa eventually went back downstairs and joined Neves.

A.N. testified that while she could usually hear yelling from downstairs, she heard none that night. But soon the children heard loud gunshots and then a scream of pain. They both ran downstairs and banged on their parents' bedroom door but it was locked. A.N. was able to get a view into the room from an outdoor patio window. She saw her mother's feet laying out on the floor with Neves standing over her, on his phone. A.N. said Neves had a "calm expression" that was "chilling." She described to the jury that: "He was, like—it's like he didn't even care. It was—it looked like was just scrolling his phone on a random Tuesday."

**B. The 911 calls**

A.N. then called 911. In her recorded call, she told the operator that Neves was "really drunk and upset." At trial, she testified that Neves became a different person when he drank, and he got drunk a lot. His drinking became more apparent to her during COVID when Neves quit traveling and stayed at home. Neves was secretive about his drinking, and once threatened A.N. when she commented on his being drunk. S.N. testified (without objection) that Neves got intoxicated at least three times a week. Both children testified that Neves became verbally abusive when drunk. A.N. told the 911 operator that she did not know when Neves had grabbed a gun. She reported the guns in the home were ordinarily kept in a locked safe in the garage.

A.N. also told the 911 operator that her parents often argued in the past, but the arguments had never gotten this bad. At trial, she added that they argued about politics and Neves's drinking. Both A.N. and S.N. were aware that Vanessa had kicked Neves out of the house two to three times because of his drinking. The drinking and arguing would wax and wane, as Neves might stop drinking for several weeks and then start up again.

Neves also called 911 at about the same time, and his recorded call was also played for the jury. The children can be heard screaming in the background. When the 911 operator asked Neves

4

what happened, he responded: "I was attacked by my wife and I shot her, so I'm guilty anyway." The 911 operator repeatedly asked Neves to assess Vanessa's breathing and the nature of her wounds. He reported that Vanessa was breathing but she was barely conscious. He said she was "shot in several parts" including her torso. The operator directed him to get a clean towel to stop the bleeding; he responded, "my life is over, so whatever." When asked to identify from which wound she bled the most, he responded by commenting, "I guess I am a terrible shot," and by also saying, "I am the most terrible shot in the world, she's been hit somewhere," "maybe her arm." On the recording, Neves can be heard telling Vanessa several times to "hang in there." When the 911 operator asked why this happened, he responded: "I was getting cussed out." At the end of the 13-minute recording, he reported that he had started CPR as Vanessa had stopped breathing. By that time, police officers and other responders arrived on scene and he was directed to step outside the house.

### C. Officers arrive on scene

Officer Albert Arevalo responded to the 911 calls. Vanessa was found lying face up on the floor of the master bedroom. Arevalo first secured the children and then went to the downstairs bedroom where other responders were attempting CPR. When EMS arrived, they found that Vanessa had no pulse, and no respirations. She also had suffered gunshot wounds to her back flank area, her right arm, and to the back of the head. Captain Irby of the Austin-Travis County EMS, who also responded to the scene, testified that life-saving measures were ceased based on policies written by doctors because Vanessa had suffered a penetrating wound to her head and she was assessed as having a Glasgow Coma Scale of three, no pulse, and no respirations.

On the floor of the bedroom, officers found six spent shell casings from a 9mm gun. They found the gun in a nearby laundry hamper. There was an additional round in the chamber and ten more in the clip.

Arevalo described that Neves appeared calm, made no frantic or hysterical comments, and remained compliant while in his presence. Detective Rory Sullivan described Neves as appearing emotionless at the time.

### D. The follow up investigation

At the station, when Neves was informed that Vanessa had died, he appeared visibly upset. The first words he uttered were "F--- me." But he otherwise remained stoic at the police station.

A search of the house showed that Neves kept several guns in the house, but they were kept either in a large gun safe in the garage or a smaller gun safe in the master bedroom. The gun in the laundry hamper was a Glock. The State elicited testimony that the Glock had three safety mechanisms to prevent accidental discharge: a trigger safety, a firing pin safety, and a drop safety. The trigger must be completely engaged to discharge a bullet. The gun is a semiautomatic, meaning the trigger would need to be completely engaged for each round fired.

The medical examiner found Vanessa suffered four gunshot wounds. The wound to the back of her head was a tangential shot. But it fractured the skull, causing blood to accumulate near her occipital lobe. Vanessa also was shot in the left side of her back with the bullet recovered from her abdomen. That bullet hit a rib, the left lower lobe of her lung, her spleen, stomach, large intestine, and perforated the aorta and inferior vena cava of her body. Vanessa also was shot in the right side of her back, with a fragment of that bullet lodging in her femur. The last wound was to Vanessa's right arm. Based on the autopsy performed, the medical examiner testified that either the gunshot to the back of Vanessa's head or to the left side of her back had caused her death.

### E. Testimony from friends and a family violence expert

At trial, the State presented testimony from five of Vanessa's friends who recounted conversations with Vanessa about her marriage, her intention at several times to get a divorce, and Neves's drinking. They also testified to specific interactions between Neves and Vanessa that they witnessed in the years and months leading up to the shooting. The State further presented an expert on domestic violence who described the cycles of violence, power, and control, often present in such relationships. Over Neves's objection, the expert was asked whether some of the friends' observations about Neves' conduct towards Vanessa was consistent with the cycles of violence or power and control exhibited in such relationships. We recount this testimony, and objections made to it, more fully below when addressing Neves's evidentiary challenges.

### F. The jury charge and the verdict

The jury charge defined murder as "intentionally or knowingly caus[ing] the death of an individual" or "intend[ing] to cause serious bodily injury and commit[ing] an act clearly dangerous to human life that causes the death of an individual." Under the charge, a person acts intentionally "with respect to a result of his conduct when it is his conscious objective and desire to cause the result." A person acts knowingly "when he is aware that his conduct is reasonably certain to cause the result." The charge also instructed the jury that "voluntary intoxication is not a defense to the commission of crime." The trial court declined to submit a charge on the lesser included offense of manslaughter.

The jury found Neves guilty of murder. In the punishment phase, the jury found that Neves did not act under the immediate influence of a sudden passion arising from an adequate cause. It assessed a 36-year sentence of confinement and a $10,000 fine.

## II. EVIDENTIARY ISSUES

Neves's first issue contends the trial court erred in three evidentiary rulings: (1) by excluding ten of his exhibits; (2) by admitting Vanessa's friends' testimony; and (3) by permitting a family violence expert to answer hypothetical questions based on the friends' testimony.

### A. Standard of review

We review a trial court's admission or exclusion of evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (en banc). When considering a trial court's decision to admit or exclude evidence, we will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Id.* at 391.

For non-constitutional error as is asserted here, we apply Texas Rule of Appellate Procedure 44.2(b) and disregard the error if it did not affect the defendant's substantial rights. Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence on determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or [that it] had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).

### B. Exclusion of Neves's exhibits

#### (1) The exhibits

Without a sponsoring witness, Neves moved to admit ten text messages that were purportedly recovered by the police from his cell phone.[4] Examples of the texts include proffered Exhibit 13 sent from Vanessa to Neves on February 3, 2019:

The reason you have exhausted long time friends, alcohol.
The reason you have lost jobs, alcohol.
The reason your mother is crushed and your family is disappointed, alcohol.
The reason your daughter and wife are anxious in your company, alcohol.
The reason your son isn't safe spending the night with you, alcohol.
The reason you can't make love to your wife, alcohol.
The reason you're out of shape and depressed, alcohol.
The reason I'm afraid to introduce you to more acquaintances, alcohol.
The reason you're in a hotel room and not here, alcohol.
My dear. This is excruciatingly simple. I'm in bed with the kids. Please don't reply.

Another example is proffered Exhibit 33, a text from Vanessa to Neves on June 5, 2021 reading:

Honey, I'm really excited about tomorrow but terrified that you'll decide that you're funnier/more social/better company when drinking. You're not. 16 years of experience has proven this. UT games, dinner parties, Halloween, etc. If people enjoyed you drunk we'd be invited to more parties, but we're not. I'm begging for you to allow me to have a party without worrying about it going bust. Please give me one night with my friends. I want you there, the fun, social, fabulous you. My parents used to love having people over, as do I, but you're drinking I can't entertain. Please show my friends the real you. They don't know how awesome you are.

Another message-chain exchanged four days before the shooting starts with Vanessa stating: "I am super proud of you and wouldn't want to go through life with anyone else. My heart leapt a bit when you waved to me this morning, even after 16 years." She follows up 10 minutes later: "Now it's your turn." Neves responds: "I have a mtg"[.] Vanessa then texts: "But you love me" and he replies, "I love you!"

---

[4] Proffered exhibits 10, 13, 16, 17, 30, 32, 33, 34, 42 and 46.

When Neves offered these exhibits, the State objected based on hearsay and the lack of a sponsoring witness, which both parties treat as a failure to authenticate the exhibits. The trial court denied the admission without a sponsoring witness.

### (2) Controlling law

Admissible evidence must be relevant and "[e]vidence has no relevance if it is not authentically what its proponent claims it to be." *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). Under evidence Rule 901(a), the proponent of evidence must make a threshold showing of evidence "sufficient to support a finding that the item [in question] is what the proponent claims it is." Tex. R. Evid. 901(a). The Court of Criminal Appeals has held that "it is the jury's role ultimately to determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic." *Fowler v. State*, 544 S.W.3d 844, 848–49 (Tex. Crim. App. 2018) (quoting *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015)); Tex. R. Evid 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.").

We review the trial court's ruling on such a preliminary question for an abuse of discretion. *Tienda*, 358 S.W.3d at 638. If the trial court's ruling that a jury could reasonably find proffered evidence authentic is at least "within the zone of reasonable disagreement," a reviewing court should not interfere. *Id*.

"Evidence may be authenticated in a number of ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence." *Id.* Rule 901 itself provides several examples that are "not a complete

list" for how evidence may be authenticated. Tex. R. Evid. 901(b). Authentication of electronic evidence "will often depend upon the nature of the evidence and the circumstances of the particular case." *Tienda*, 358 S.W.3d at 639. As that Court explained:

> Printouts of emails, internet chat room dialogues, and cellular phone text messages have all been admitted into evidence when found to be sufficiently linked to the purported author so as to justify submission to the jury for its ultimate determination of authenticity. Such prima facie authentication has taken various forms. In some cases, the purported sender actually admitted to authorship, either in whole or in part, or was seen composing it. In others, the business records of an internet service provider or a cell phone company have shown that the message originated with the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have had access to the computer or cell phone. Sometimes the communication has contained information that only the purported sender could be expected to know. Sometimes the purported sender has responded to an exchange of electronic communications in such a way as to indicate circumstantially that he was in fact the author of the particular communication, the authentication of which is in issue. And sometimes other circumstances, peculiar to the facts of the particular case, have sufficed to establish at least a prima facie showing of authentication.

*Id.* at 639–40 (footnotes omitted).

### (3) Application

Neves urged at trial that the texts messages, which were received in discovery from the State, were authenticated by their appearance, content, and substance, citing Tex. R. Evid. 901(b)(4). Without more discussion, he claimed there is "no question as to their authenticity." On appeal he adds the document is self-authenticating under Tex. R. Evid. 902(7) by the inclusion of a trade inscription. Each document contains a stamp reading "Source Extraction: Advanced Logical." And one exhibit contains a page header titled "Extraction Report–Cellebrite Reports" with the Cellebrite company logo included.

We conclude that the trial court did not abuse its discretion in excluding the exhibits where nothing more was before the jury—the ultimate arbitrator of authentication—allowing it to decide

11

the exhibits authenticity. Both the lead and second detectives testified in this case. Each could have been asked about the seizure of Neves's phone, the downloading of its contents, and the process for doing so. Or a business record affidavit from Cellebrite could have been obtained to establish the documents as business records of that company. But by simply offering the exhibits with no sponsoring witness, or evidence explaining the exhibits, the jury would have nothing to explain the origin or integrity of the documents.

Each text contains a "From" or "To" line with a telephone number followed by text reading "ICE Wife Vanessa Neves."[5] Nothing in the record ties that phone number to Vanessa or explains the origin of messages that Neves claims she was the author or recipient. We agree with the Austin Court of Appeals that Rule 901 "does not erect a particularly high hurdle, and that hurdle may be cleared by circumstantial evidence." *Campbell v. State*, 382 S.W.3d 545, 549 (Tex. App.—Austin 2012, no pet.) (quoting Peter T. Hoffman, *Texas Rules of Evidence Handbook,* Article IX at 948 (8th ed. 2008–09)). But here, there was no sponsoring witness or circumstantial evidence in the record to support authentication, and consequently, the trial court did not abuse its discretion in excluding the evidence. Or as the *Tienda* court explained: "That an email on its face purports to come from a certain person's email address, that the respondent in an internet chat room dialogue purports to identify himself, or that a text message emanates from a cell phone number assigned to the purported author—none of these circumstances, without more, has typically been regarded as sufficient to support a finding of authenticity." *Tienda*, 358 S.W.3d at 641.[6] The first thread of Neves's first issue is overruled.

---

[5] Only Exhibit 46 identifies the recipient of the text message, Scott Milner. In that text exchange, Vanessa is attempting to retain his legal services in February 2019 to obtain a divorce from Neves.

[6] We also agree with the State that the claim the document was self-authenticating under Tex. R. Evid. 902(7) was not made below and cannot now be urged as a reason the trial court abused its discretion. A party must "let the trial judge

### C. Admission of testimony from Vanessa's friends

#### (1) The challenged testimony

The trial court allowed the State to elicit testimony of five witnesses—all friends of Vanessa—who testified to statements that Vanessa made to them, and in some instances to direct observation of the interactions between Neves and Vanessa. Neves took each witness on voir dire and objected that the testimony elicited hearsay, violated Texas Rule of Evidence 404(b), and was unfairly prejudicial under Rule 403.

The trial court excluded some of the proffered testimony, but allowed the witnesses to testify to the following matters:

#### (a) Laura Watts

Laura Watts knew Vanessa for ten years and described herself as a best friend. In 2019, Vanessa told Watts that she was going to get a divorce, and she had met with a divorce attorney. Watts was also Neves's and Vanessa's realtor. In November and December 2020, she helped Neves and Vanessa downsize their home because they planned to get a divorce. With Watts' assistance, they sold their previous home and moved into the condominium where the shooting occurred. During this process, Watts once met with the couple to discuss offers and noticed that Neves had been drinking. The discussion became louder and louder, but Watts described: "Vanessa did her magic and calmed the whole situation down." Watts later complimented Vanessa on deescalating the situation, and she responded, "Oh honey, years of practice." After the couple was living in the

---

know what he wants, *why he thinks he is entitled to it*, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (emphasis supplied). Preserving error is a "systemic requirement," and if error has not been preserved, we should not address the merits of that issue. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).

condo, they both called Watts to ask her to find an apartment nearby for Neves to move into, but Vanessa called two days later to say they were going to work it out and no longer needed the apartment.

**(b) Lynda Quintana**

Lynda Quintana befriended Vanessa in 2013. They spoke to each other every day, texting each other almost every day. At a birthday party in 2019, Vanessa confided to Quintana that she could not take Neves's drinking anymore and that she had talked to a divorce attorney. When Quintana later asked why she did not go through with the divorce, Vanessa said that she still loved Neves and missed who he used to be, thinking she could get it back. Quintana and Neves were on opposite ends of the political spectrum and Quintana felt that Neves tried to pick political arguments with her, exhibiting a sarcastic and arrogant tone. She also had first hand observations of Neves at a school charity silent auction, where he was stumbling drunk to the point of embarrassing Vanessa. Because Quintana's children often went to Vanessa's house, she talked to Vanessa about guns in the house. Vanessa showed her the safe where the guns were locked up. In 2021, Quintana also knew that Vanessa had put together a resume and started back to work, and did so with the intention of possibly getting out of the marriage.

**(c) Jennifer Cook-Mishkin**

Jennifer Cook-Mishkin knew both Vanessa and Neves. In April 2021, she went to see Neves at his condo to review an HOA inspection report on another condo that Cook-Mishkin was considering buying; Neves had the inspection report through his position on the condo association. Vanessa was present as Neves and Cook-Mishkin went line-by-line over the report. Cook-Mishkin could tell that Neves had been drinking. In response to one of Vanessa's comments about the report, Neves said "you don't know what you're talking about. Like, why are you in here." Neves's

comments to Vanessa got progressively worse and angrier. She described that, at one point, Neves told Vanessa "she didn't know what she was f---king talking about, that she was so f---king stupid."

### (d) Lena Teffer

Lena Teffer met Vanessa through their children's mutual activities. A month before the shooting, Vanessa and Neves were at the Teffer's house for a pool party. At one point, the adult couples were discussing the logistics of dropping children off at school. When Vanessa made a comment on that topic, Neves's demeanor changed dramatically and he began using expletives, saying that she had never dropped off the children before and she did not know "what you're effing talking about." Even though Teffer thought Neves's comments were threatening and unnerving, Vanessa stayed calm. After the party, Teffer realized that Neves had gone to their liquor cabinet and had "mostly polished off" a bottle of good bourbon that night. She believed that things were unraveling for the couple before the murder.

### (e) Amber Cotton

Amber Cotton knew Vanessa since 2017. She did "safety planning" with Vanessa, which she described as helping a victim of domestic violence get out of a relationship safely. Cotton was aware of safety planning from a protective order that she had obtained for herself and her prior work in law enforcement. As a part of the planning, Cotton provided Vanessa with a phone number for a shelter and counselor. She also discussed with Vanessa getting weapons out of the house. Vanessa assured her that the gun in the house was locked up, so she would have time to run if needed. Vanessa also confided with Cotton that she had not pursued a divorce out of concern for the children. These conversations started in 2018. At one point, Vanessa told Cotton: "If I ever go missing, I didn't leave. You're looking for my body. I would never leave the children.

Please tell the police." Cotton contacted the Austin Homicide Department the day after the murder to relate these comments.

### (f) The limiting instruction

The jury charge included the following instruction regarding these witnesses:

> During the trial, you heard evidence that the defendant may have committed wrongful acts not charged in the indictment. The State offered this evidence to show the nature of the relationship between the parties. You are not to consider that evidence at all unless you find beyond a reasonable doubt that the defendant did in fact commit the wrongful act. You may consider this evidence only for the limited purpose I have described. You may not consider this evidence to prove that the defendant is a bad person and, for this reason, was likely to commit the charged offense. To consider this evidence for any other purpose would be improper.

### (2) Controlling law

Two statutory provisions color the scope of admissible evidence in this case. First, Article 38.36(a) of the Code of Criminal Procedure provides:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

Tex. Code Crim. Proc. Ann. art. 38.36. Similarly, Article 38.371(b) provides:

> In the prosecution of an offense described by Subsection (a) [offense committed against member of defendant's family or household], subject to the Texas Rules of Evidence or other applicable law, each party may offer testimony or other evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense described by Subsection (a), including testimony or evidence regarding the nature of the relationship between the actor and the alleged victim.

Tex. Code Crim. Proc. Ann. art. 38.371(b). These provisions must still be harmonized with the rules of evidence. *Id.* at art. 38.371(c) ("This article does not permit the presentation of character evidence that would otherwise be inadmissible under the Texas Rules of Evidence or other applicable law."); *Garcia v. State*, 201 S.W.3d 695, 702 (Tex. Crim. App. 2006) (stating that while

prior acts of violence between the victim and the accused may illustrate the nature of a relationship under Article 38.37, they still "must meet the requirements of the Rules of Evidence in order to be admissible").

So, we parse Neves's three objections to these witnesses: hearsay, Rule 404(b), and Rule 403.

### (a) Hearsay

Hearsay is a statement made by a declarant outside of the testimony at the current proceeding that a party offers in evidence to prove the truth of the matter asserted. Tex. R. Evid. 802. Absent an exclusion or exception to the rule, hearsay is not admissible. *Id.* Two exceptions are raised here. Under the present-sense impression exception, a court may allow a declarant's hearsay statement describing or explaining an event or condition made *while* or *immediately after* the declarant perceived it. Tex. R. Evid. 803(1); *Mireles v. State*, No. 08-19-00221-CR, 2022 WL 3572859, at *6 (Tex. App.—El Paso Aug. 19, 2022, pet. ref'd) (not designated for publication). Additionally, Rule 803(3) excepts from hearsay "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." Tex. R. Evid. 803(3). By example, a victim's statement three weeks before her murder that she was afraid of the accused fell within the Rule 803(3) hearsay exception, as did her request to call the sheriff's office. *Martinez v. State*, 17 S.W.3d 677, 688 (Tex. Crim. App. 2000) (en banc).

Neves urges that the statements made by Vanessa to her friends were hearsay to which no exception applied. We disagree.

17

First, Vanessa's statements that she intended at one time or another to get a divorce fall within the Rule 803(3) exception as showing Vanessa's then existing state of mind (motive, intent, or plan.). *See Martinez v. State*, 186 S.W.3d 59, 67 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd.) (concluding that victim's statement that she was wanted to leave defendant was admissible under Rule 803(3)); *Smith v. State*, No. 01-15-01055-CR, 2017 WL 929544, at *2 (Tex. App.—Houston [14th Dist.] Mar. 9, 2017, pet. ref'd) (mem. op.) (holding the statement that victim intended to leave accused met exception); *Dorsey v. State*, 24 S.W.3d 921, 928 (Tex. App.—Beaumont 2000, no pet.) (testimony that victim said she was thinking of leaving defendant and wanted the name of a divorce attorney was admissible under Rule 803(3)); *Vann v. State*, 853 S.W.2d 243, 250 (Tex. App.—Corpus Christi 1993, pet. ref'd) (victim's statement that he was not happy in his marriage and wanted to find a way out was admissible as a statement of his emotional state and intent to act). This application of Rule 803(3) would permit Vanessa's statement to Watts that she was going to get a divorce, and she had met with a divorce attorney. Similarly, the statements to Watts about why the couple was selling their home and downsizing, and then looking for an apartment for Neves also fit the exception. It would also allow Vanessa's statements to Quintana that she could not take Neves's drinking anymore, that she had talked to a divorce attorney, and her later statement that she backed out of the divorce. It would also permit Vanessa's statement of motive in 2021 to put together a resume and start back to work to possibly get out of the marriage.

Second, Rule 803(1)—present sense impression—would apply to other statements. For instance, after Watts complimented Vanessa on her ability to calm Neves down, Vanessa responded "Oh honey, years of practice." From the context of the discussion, the trial judge did not abuse his discretion in finding that the statement was made at or near the time of the event described.

Third, some of Vanessa's statements were not offered for the truth of the matter asserted and fall outside the hearsay rule. For instance, Vanessa's statement at the pool party about the school drop-off as witnessed by Teffer, and her statement about the condo inspection report as witnessed by Cook-Mishkin, were not offered to prove the truth of those matters. Instead, they were offered to contextualize Neves's inappropriate reaction to them. *See Magee v. State*, No. 14-23-00396-CR, 2024 WL 3980248, at *9 (Tex. App.—Houston [14th Dist.] Aug. 29, 2024, pet ref'd) (mem. op.) ("The text messages were admitted into evidence to show appellant's state of mind with regard to his reaction to the complainant's messages."). Similarly, some of the complained of statements are tied to conduct which is not hearsay. Quintana was concerned about guns in Vanessa's house because her children often went there. Vanessa *showed* her the safe where the guns were locked up.

The one statement that does not fall neatly within Rule 803(1) or (3) is Vanessa's declaration to Cotton that "If I ever go missing, I didn't leave. You're looking for my body. I would never leave the children. Please tell the police." That statement is more a prediction of future events. *See Dorsey*, 24 S.W.3d at 927–28 (victim' statement that "she believed that if anything strange happened to her, like a weird car accident, it meant Dorsey had killed her" was not covered by Rule 803(3)); *Barnum v. State*, 7 S.W.3d 782 (Tex. App.—Amarillo 1999, no pet. h.) (deceased's statement that she believed her husband might be planning to murder her for life insurance proceeds was a statement of belief and not admissible under Rule 803(3)). But even if admission of this one statement was erroneous, an issue we do not reach, its admission would not rise to the level of reversible error.

Non-constitutional error that does not affect a substantial right is harmless if the court is "fairly assured that the error did not influence the jury or had but a slight effect[.]" *Ray v. State*,

178 S.W.3d 833, 836 (Tex. Crim. App. 2005). We make this determination by reviewing the entire record and considering "(1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error." *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018).

This was *not* a case of who shot Vanessa, but of why. Yet, the gist of Vanessa's statement was directed to who might cause her to go missing, and not why. Moreover, the other unobjected to evidence supporting guilt was substantial. On the evening of the murder, Neves had earlier threatened to strangle his young daughter with a plastic bag. He frightened the children to such a degree that they ran from him, locking doors behind them, only to have him pick the locks. S.N. testified Neves had multiple guns in the house but he ordinarily kept them stored in a safe, not left unsecured. In his 911 call, Neves gave conflicting statements about why the shooting occurred (first saying he was "attacked," and later saying he was "cussed out") but also adding that he was "guilty" and he was "the most terrible shot in the world." His demeanor was stoic, calm, and chilling, as witnessed by his daughter, two detectives at the scene, and one at the police station. Six rounds were fired from the gun, with two striking Vanessa in the back. The gun would only fire by affirmatively applying pressure to the trigger, and doing so for each round fired. Considering the entire record, we are satisfied that the statement to Cotton did not influence the jury or had but a slight effect.

### (b) Rule 404(b)

Generally, extraneous-offense evidence is not admissible at the guilt phase of trial to prove that a defendant committed the charged offense in conformity with his own bad character. Tex. R. Evid. 404(b)(1); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). But extraneous-

offense evidence may be admissible when it has relevance apart from character conformity. Tex. R. Evid. 404(b)(2); *Devoe*, 354 S.W.3d at 469; *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009). That is, the State may not offer such evidence for the *sole* purpose of "showing that the accused acted in conformity with his bad character and murdered the victim." *Garcia v. State*, 201 S.W.3d at 703; *Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016) ("Rule 404(b) is a rule of inclusion rather than exclusion—it excludes only evidence that is offered solely for proving bad character and conduct in conformity with that bad character.").

So this kind of evidence may be admissible when it is relevant to a "noncharacter conformity issue of consequence" such as the defendant's intent or defensive theories. *Robbins v. State*, 88 S.W.3d 256, 259 (Tex. Crim. App.2002); *see also* Tex. R. Evid. 404(b) (evidence may be admissible to prove, among other things, motive, intent, and absence of mistake or accident). Another avenue for relevant and admissible extraneous-offense evidence is that which contextualizes the nature of the relationship between victim and assailant. *See, e.g., Fernandez v. State*, 597 S.W.3d 546, 565–66 (Tex. App.—El Paso 2020, pet. ref'd); *Gonzalez v. State*, 541 S.W.3d 306, 312 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Neves argues that the friends' testimony amounted to a showing that he was a mean drunk, and therefore it was only used to show that he acted in conformity with that bad character on the night of the shooting. We disagree.

Evidence of Neves's conduct when intoxicated was probative of his intent, state of mind, and motive. *See Guerrero v. State*, No. 14-10-00840-CR, 2011 WL 6808314, at *1 (Tex. App.—Houston [14th Dist.] Dec. 22, 2011, no pet.) (mem. op.) (holding that evidence of the defendant's drinking problem and his verbally abusive comments after drinking alcohol were "extremely probative to show, among other things, appellant's intent, state of mind, or motive

21

on the day" he injured a child).[7] It also contextualized Neves's relationship with Vanessa. The interaction between Neves and Vanessa that Watts witnessed during the house sale, and the interaction that Teffer witnessed at the pool party tell a story. When Neves became loud and aggressive when drunk, Vanessa kept her cool and acted to diffuse the situation. This characteristic of Vanessa could inform the jury's assessment of Neves's motive at the time of the shooting. A calm, conflict-deescalating Vanessa is the opposite of the picture Neves tried to paint in the 911 call.

Finally, the evidence also fits the picture painted by the State of a marital relationship that was unraveling. Vanessa had taken steps towards divorce in 2019 but backed away. But Neves's drinking, and his conduct while intoxicated continued. In April 2021, Cook-Mishkin witnessed Neves denigrate Vanessa over her comment about an inspection report. A month before the shooting, Teffer witnessed a similar, threatening and unnerving public comment at a pool party. She also believed that things were unraveling before the murder. In 2021, Quintana also knew that Vanessa had put together a resume and started back to work, doing so with the intention of possibly ending her marriage. The timeline of these events, coupled with other testimony that abusive spouses feel most threatened when the abused spouse is about to leave, were all relevant to intent, the central issue of intent.[8] *See Franco v. State*, No. 08-18-00040-CR, 2020 WL 3168560, at *8

---

[7] Neves's counsel raised this issue in opening statement by rhetorically posing the following question: "Did he intend to kill Vanessa or was it something different?" Similarly, he questioned whether Neves's alcoholism meant the offense amounted to murder or asked whether "it [was] a mistake." Rebuttal of a defensive theory is one of the permissible uses for which "crimes, wrongs, or other acts" may be admitted under Rule 404(b)(2). *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003); *Sandoval v. State*, 409 S.W.3d 259, 301 (Tex. App.—Austin 2013, no pet.).

[8] The possible outlier prior bad act was Neves raiding the Teffer's liquor cabinet. Bad as that act might be, it is so far from the act of murder that even if inadmissible, it would not affect Neves's substantial rights. *See Taylor v. State*, 920 S.W.2d 319, 322–23 (Tex. Crim. App. 1996) (explaining that when the extraneous act is not more heinous than the charged offense, the extraneous act is not likely to cause unfair prejudice).

(Tex. App.—El Paso June 15, 2020, n pet.) (not designated for publication) (holding prior acts of defendant demonstrated his controlling and aggressive behavior that defined the family relationship and were a permissible, non-character-conformity purpose under Article 38.371).

### (3) Rule 403

Finally, Neves challenges the friends' testimony under Rule 403. In applying that rule, a court must assess the balance of factors including: (1) the strength of the evidence's probative value, (2) the potential for the evidence to "impress the jury in some irrational but nevertheless indelible way," (3) The amount of time required at trial to develop the evidence, and (4) the proponent's need for the evidence. *Montgomery*, 810 S.W.2d at 389–90; *see* also *Hart v. State*, 688 S.W.3d 883, 891 (Tex. Crim. App. 2024) (applying the four *Montgomery* factors as the test under Rule 403). "Rule 403 favors admissibility of relevant evidence, and the presumption is that the relevant evidence will be more probative than prejudicial." *Montgomery*, 810 S.W.2d at 389.

### (a) The strength of the evidence's probative value

The first and fourth balancing factors involve the probative value of the evidence and the proponent's need for the evidence. *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). "Probative value" means more than simply relevance. *Id*. The phrase "refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Id.* If the proponent of the challenged evidence has other compelling or undisputed evidence to establish the proposition or fact that the challenged evidence seeks to prove, then the probative value of the extraneous offense evidence weighs far less than it otherwise might in the probative-versus-prejudicial balance. *Id.*

As we set out above, the State needed the evidence to rebut a defensive theory raised by Neve's opening statement and to establish the nature of the relationship between Neves and Vanessa.[9] The chronology of the couple's deteriorating relationship offered one strong clue to that question. While the children's testimony substantiated Neves's drinking, his conduct while intoxicated, and the strained marriage, they did not testify to the accelerating problems the year of the shooting. They did not witness the incident at the pool party or the confrontation over the condo report. Neves emphasizes that some of the divorce plans were in 2019, but when viewed as whole, the testimony established a timeline of increasing marital discord. The State was also entitled to put on evidence to corroborate the testimony of the children, who were estranged from Neves by the time of trial. Each of the adult friends established their close relationship with Vanessa and their observations were highly probative of Vanessa and Neves's relationship.

### (b) Appeal to a decision on an improper basis

The phrase "unfair prejudice" refers to a tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one. *Id*. at 641; *Inthalangsy v. State*, 634 S.W.3d 749, 758 (Tex. Crim. App. 2021). "Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence." *Gigliobianco*, 210 S.W.3d at 641. "Unfair prejudice refers to the evidence's "tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged." *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005). "If the probative value of the

---

[9] In his opening statement, Neves's counsel framed the real question of the trial as Neves's intent at the time of the shooting. Counsel argued the jury should focus on whether Neves intended to kill Vanessa or whether it was something different considering there was no evidence of him planning the shooting or writing letters of his intent. Counsel then suggested to the jury that the incident "was something that was unexplained."

evidence is not substantially outweighed by the risk of unfair prejudice, the court should admit the evidence." *Inthalangsy v. State*, 634 S.W.3d at 758.

The fact that evidence shows a defendant in a negative light is not sufficient to justify its exclusion on Rule 403 grounds. "Rule 403 does not allow the exclusion of evidence just because it is prejudicial to the defendant; all evidence that a defendant is guilty is prejudicial in this sense." *Trevino v. State*, No. 08-23-00111-CR, 2024 WL 339117, at *4 (Tex. App.—El Paso Jan. 29, 2024, no pet.) (mem. op., not designated for publication); *see also DeLeon v. State*, 77 S.W.3d 300, 315 (Tex. App.—Austin 2001, pet. ref'd) ("Almost all evidence offered by the prosecution will be prejudicial to the defendant."). "To fall within the scope of Rule 403, the risk must be of *unfair* prejudice." *Trevino*, 2024 WL 339117, at *4; *see also DeLeon*, 77 S.W.3d at 315 ("Only evidence that is *unfairly* prejudicial should be excluded.").

Each of the categories of testimony of which Neves complains—i.e., drinking to excess, demeaning comments to Vanessa, and aggressively picking political arguments—painted Neves in a poor light. Yet we are unconvinced they were so *unfairly* prejudicial as to cause the jury to convict Neves of murder. None of the conduct is necessarily criminal. It was certainly less prejudicial than other unobjected to testimony, such as Neves threatening to strangle his daughter, or his demeanor on the recorded 911 call.

### (c) The amount of time devoted to the evidence.

Rule 403 is one of "judicial economy. It excludes otherwise relevant evidence when the costs of admission outweigh its utility." *Hart*, 688 S.W.3d at 891. As a part of that balance, it considers "confusion of the issues," meaning a tendency to confuse or distract the jury from the main issues in the case. *Gigliobianco*, 210 S.W.3d at 641. "Evidence that consumes an inordinate amount of time to present or answer, for example, might tend to confuse or distract the jury from

the main issues." *Id.* "Misleading the jury," refers to a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds. *Id.* Finally, "undue delay" and "needless presentation of cumulative evidence," are "self-explanatory and concern the efficiency of the trial proceeding rather than the threat of an inaccurate decision." *Id.*

Neves contends that the friends' testimony on Neves's drinking, combined with evidence of his conduct when drunk, unfairly highlighted an issue he had not contested at trial, and the evidence was cumulative of what the children had already testified about during their trial appearance. He adds that the third, fourth, and fifth friends' testimony was additionally redundant. We disagree.

While each of the friends testified outside the presence of the jury as part of the trial court's assessment of the Rule 403 balance, all five completed their testimony before the jury in 51 total pages of the record.[10] The friends all testified to different specific events and we find almost no overlap in their testimony. Much of the friends' testimony provided concrete examples of what the children more generally described. Moreover, each of the friends' testimony was necessary to put together the complete chronology that the State relied on, and which the children did not testify about.

In conclusion, the trial court did not abuse its discretion in finding the probative value of the evidence is not substantially outweighed by any "unfair prejudice, confusion of the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid 403

**D. Admission of the family violence expert**

**(1) The testimony**

---

[10] The balance of the State's case covers 374 pages of testimony.

The State offered Roxana Ortega-Hart, the supervisor for Victims Services with the Austin Police Department, as an expert on domestic violence issues.[11] She testified without objection to the cycles of violence, or power and control, in some domestic relationships. She described four phases in those relationships: a crisis phase, when victim reaches out to law enforcement or make a report; a honeymoon phase, when a report does not work and the batterer maintains power and control by making promises that they do not intend to keep (like to stop drinking); a calm phase, where nothing happens and victim thinks the relationship is going back to where it started; and a tension-build up phase, where the victim tries to appease abuser as tensions build back to crisis phase. She testified that the violence could be physical or psychological.

Neves objected under 404(b) when the State asked the expert hypotheticals based on some of the conduct described by the five friends. For instance, she was asked whether it would be consistent for someone who experienced domestic violence to try to get a divorce, then choose to stay in the marriage. Similar hypotheticals were asked about safety planning, the victim getting a job or separate bank account, the victim being the peacemaker, the abuser yelling at the victim in front of others (and this tends to increase as the abuser feels more comfortable and the abuse escalates), and the abuser threatening the children from relationship. The expert did not express any opinion specifically about Neves. She did testify that alcohol does not cause domestic violence but can make the abuser more unpredictable. And the most dangerous time for a victim is when they try and leave because the abuser may lose their power and control.

---

[11] No objection was made to her qualifications, therefor we do not set out her background further.

27

### (2) Controlling law

Experts must be qualified, and their opinions reliable and relevant. Tex. R. Evid. 702; *Wells v. State*, 611 S.W.3d 396, 426 (Tex. Crim. App. 2020). A party may elicit expert opinions through hypothetical questions if the hypothetical questions are based on facts in evidence. *Id*. at 439. "An expert may give an opinion on facts made known to him at trial through the use of hypothetical questions, so long as the facts utilized by the hypothetical are admitted into evidence, or are facts assumed by counsel 'in accordance with the theory of his case.'" *McMillin v. State*, No. 03-03-00488-CR, 2005 WL 121832, at *8 (Tex. App.—Austin Jan. 21, 2005, no pet.) (mem. op., not designated for publication) (quoting *Matson v. State*, 819 S.W.2d 839, 853 (Tex. Crim. App. 1991)).

The third thread of Neves's first issue contends the trial court erred in allowing the hypothetical questions. We disagree. The only objection made to the testimony was that it violates Rule 404(b). But the hypotheticals asked did no more than paraphrase the testimony already in the record about Neves. There was no new Rule 404(b) type evidence raised. As we have already addressed Neves's Rule 404(b) objection above, we overrule it here for the same reason.

In sum, we overrule all three subparts of Neves's first issue.

## III. THE JURY CHARGE

In his second issue, Neves argues that the trial court abused its discretion by failing to instruct the jury on the lesser-included charge of manslaughter because the evidence was sufficient to have allowed the jury to rationally conclude that Neves acted with recklessness. *See* Tex. Penal Code Ann. § 19.04(a) (" A person commits [manslaughter] if he recklessly causes the death of an individual.").

**A. Standard of review and applicable law**

We review a trial court's refusal to include a requested lesser-included offense for abuse of discretion. *See Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004) (en banc.). Under the controlling *Rousseau/Royster* analysis, we apply a two-step test to determine whether a trial court should have issued a lesser-included offense instruction. *Id*.; *see also Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App. 1993) (en banc); *Royster v. State*, 622 S.W.2d 442, 446 (Tex. Crim. App. [Panel Op.] 1981). First, we determine whether the offense is a lesser-included offense of the charged offense. *Threadgill*, 146 S.W.3d at 666. Next, we determine whether the record contains some evidence that would permit a rational jury to find that the defendant is guilty only of the lesser offense. *Id*. There must be some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser offense, and the evidence must establish the lesser-included offense as a valid rational alternative to the charged offense. *Id*.

**B. Analysis**

**(1) Manslaughter is a lesser-included offense of murder**

Neves argues, and the State concedes, that manslaughter is a lesser-included offense of murder. It has the same elements as murder—that is, that the defendant caused a death—but it has a different mens rea requirement. Manslaughter only requires the State to prove the defendant acted "recklessly," rather than "intentionally or knowingly," thereby making it a lesser-included offense of murder. *See McKinney v. State*, 207 S.W.3d 366, 370 (Tex. Crim. App. 2006) (recognizing that the elements of manslaughter and murder are the same with the exception of the defendant's mental state); *Cavazos v. State*, 382 S.W.3d 377, 386 (Tex. Crim. App. 2012) (recognizing that the difference between murder and manslaughter is "intent versus recklessness" and that manslaughter is therefore a lesser-included offense of murder).

**(2) The record does not contain sufficient evidence of Neves's recklessness to justify the issuance of an instruction on deadly conduct**

Next, we consider whether there is evidence in the record to justify the issuance of the lesser-included instruction. *See Threadgill*, 146 S.W.3d at 666. To do so, we examine all the record to determine whether an instruction on the lesser-included offense is warranted. *Cavazos v. State*, 382 S.W.3d at 384. When the defendant is charged with an intent-oriented offense, to establish that he is entitled to an instruction on a lesser-included offense with recklessness as its culpable mental state, there must be some affirmative evidence that the defendant did not intend to cause death or serious bodily injury when he assaulted the victim. *See id.* at 385. And there must be some evidence that the defendant was aware of but consciously disregarded a substantial and unjustifiable risk that death or serious bodily injury would result from his conduct. *See id.*[12]

Neves urges that the record supports recklessness based on several factors to include: his intoxication, his calling of 911, his assisting with life-savings efforts, and that Vanessa's wound to the back of her head could be described as a "graze" injury. We disagree.

First, voluntary intoxication is not a defense. Tex. Penal Code Ann. § 8.04(a) ("Voluntary intoxication does not constitute a defense to the commission of crime."). Section 8.04 was likely enacted by the Legislature to overturn prior case law that had allowed evidence of intoxication "to throw light upon the mental status of the offender[.]"). *See Taylor v. State*, 885 S.W.2d 154, 155 (Tex. Crim. App. 1994) (en banc) (quoting *Evers v. State*, 20 S.W. 744, 746–47

---

[12] "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." Tex. Penal Code Ann. § 6.03(a). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.*

30

(Tex. Crim. App. 1892). Neves cites no authority that allows him to bootstrap his voluntary intoxication into evidence sufficient to support a lesser-included instruction to a murder charge. Case law is to the contrary. *See Skinner v. State*, 956 S.W.2d 532, 536, 543–44 (Tex. Crim. App. 1997) (rejecting the defendant's argument that his voluntary intoxication supported lesser-included charge of murder to capital murder).

Nor does Neves' calling of 911 after the shooting under the record presented here support a claim of recklessness. In the 911 call, Neves first claimed he shot Vanessa because she "attacked him," but he later reported that he was "getting cussed out." Nothing in the call suggests recklessness. He claimed in the call that he provided first aid to Vanessa, as directed by the 911 operator. But he can also be heard on the recording stating, "my life is over, so whatever." A.N. viewed Neves making the 911 call and described that he had a "calm expression," "like he didn't even care." Nor does the possibility that one of the four bullet wounds described as a "graze" suggest recklessness, particularly when two bullets struck Vanessa in the back, one of which would have been a mortal wound. Added to this tapestry of facts, Neves fired the gun six times, each time requiring a pull of the trigger. The gun was ordinarily kept secured and would have to have been retrieved by unlocking a gun safe. The same evening, Neves had chased his daughter with a plastic bag threatening to strangle her. The children did not hear any argument before the shooting, which was only a few minutes after Neves and Vanessa retired to their bedroom.

Neves cites no case allowing a lesser included charge on analogous facts. We view the case closer to *Cavazos v. State* where the defendant pulled out a firearm in a crowded room and shot the victim twice, killing him. *Cavazos*, 382 S.W.3d at 380. Several days later, the defendant told a witness that he did not intend to shoot the victim. *Id*. The defendant was charged with and convicted of murder, and the trial court refused to issue an instruction on the lesser-included

31

offense of manslaughter. *Id*. The defendant claimed on appeal that there was no evidence that he intentionally fired the gun at the victim, and that because his conduct constituted mere recklessness, he was entitled to an instruction on manslaughter. *Id*. at 385. The Court of Criminal Appeals held that the defendant was not entitled to an instruction on manslaughter, reasoning that "[p]ulling out a gun, pointing it at someone, pulling the trigger twice, fleeing the scene (and the country), and later telling a friend 'I didn't mean to shoot anyone' does not rationally support an inference that [he] acted recklessly at the moment he fired the shots." *Id*. Acknowledging that while "weak or contradicted" evidence might support the submission, the record must contain "more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Id*. Because that kind of evidence is missing on this record, we conclude the trial court did not abuse its discretion in declining to charge on manslaughter. We overrule Neves's second issue.

## IV. CUMULATIVE ERROR

Finally, in Issue Three, Neves claims the cumulative effect of the above errors requires reversal.

Multiple errors may be harmful in their cumulating effect on the defense even if each error would be harmless standing on its own. *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (en banc), *cert. denied*, 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000) (but also explaining that unless and until multiple errors are found to have been committed, there can be no cumulative error effect because non-errors cannot in their cumulative effect create harmful error). The mere existence of multiple errors, however, does not warrant reversal unless they operate in concert to undermine the fundamental fairness of the proceedings. *Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010); *see also Murphy v. State*, 112 S.W.3d 592, 607

(Tex. Crim. App. 2003) ("Because we have found little or no error in the above-alleged points, there is no harm or not enough harm to accumulate.").

If the individual claims of error lack merit, then there is no possibility of cumulative error. *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009); *Chamberlain*, 998 S.W.2d at 238. We overrule Issue Three.

## V. CONCLUSION

We overrule each of Neves's three issues. The trial court's judgment is affirmed.


GINA M. PALAFOX, Justice


May 20, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

(Do Not Publish)